**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CARMEN DIXON-ROLLINS** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 09-646** |
| **vs.** | ) | |
| | ) | |
| **EXPERIAN INFO. SOLUTIONS, INC., et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**PLAINTIFF CARMEN DIXON-ROLLINS'**
**COUNTER-STATEMENT OF FACTS**

Plaintiff Carmen Dixon-Rollins, through counsel, hereby respectfully submits this Counter-Statement of Facts setting forth her admissions and denials to Defendants Trans Union, LLC's ("TU") and Associated Credit and Collections Bureau, Inc.'s ("ACCB") proposed facts, as well as her own additional relevant facts.

**A.      Plaintiff's Admissions And Denials To Defendant TU's Proposed Facts**

1.      Admitted.

2.      Admitted.

3.      Admitted.

4.      Admitted.

5.      Admitted.

6.      Admitted.  By way of further answer, Mrs. Dixon-Rollins received an interest rate of 5.5% for her mortgage refinancing in 2009 but sought a lower rate.  She originally was quoted a lower rate of 5% and may have qualified for an even lower rate of 4.75% or 4.6%.  (*See* Dixon-Rollins' Dep. at 38:21-40:6, pages from Plaintiff's deposition cited herein are attached hereto as

Exhibit 1; Tomas Norton's Dep. at 117:1-118:18, pages from Norton's deposition cited herein are attached hereto as Exhibit 2; and Exhibit 49, *supra*, Norton's expert report).

7.      Admitted in part.  Denied in part.  Plaintiff admits that her Trans Union credit score was not considered after it was determined that she was eligible for an FHA loan but was considered by Gateway Funding initially to determine whether Plaintiff would have qualified for a conventional loan as an "A paper borrower" which had a lower interest rate.  (*See* Jarred Nelson's Dep. at 8:11-9:16, 36:22-40:9, pages from Nelson's deposition cited herein are attached hereto as Exhibit 3).

8.      Admitted.

9.      Admitted in part.  Denied in part.  By way of further answer, once Mr. Nelson determined that Plaintiff's credit score, including her TU credit score, would only qualify Plaintiff for an FHA loan, Mr. Nelson stated that Mrs. Dixon-Rollins received a higher interest rate on that FHA loan because his office had to do more work because of the ACCB account. (*See* Exhibit 3 at 81:12-18).

10.      Denied.  Plaintiff was not "maxed out."  In fact Mr. Nelson testified that "maxed out means she's at 100 percent.  She's not at 100 percent."  (*See* Exhibit 3 at 51:7-14).  Admitted that, according to Mr. Nelson, Plaintiff had credit utilization of over 75% on some of her accounts.

11.       Denied.  There is no evidence as to a 77% credit utilization on the day of the Wells Fargo application.

12.      Denied.  (*See* Exhibit 4, Wells Fargo adverse action letter citing TU credit report as reason for denial, including derogatory account).

13.      Admitted.  The APR was 12.9%.  (*See* Exhibit 46, *supra*, FCC loan document).

14.     Admitted.

15.     Denied.  Plaintiff claims emotional distress for all of her lost credit opportunities, including Wells Fargo, and also claims other emotional distress damages, not only headaches. (*See* Exhibit 1 at 109:11-20 and PCSF at ¶¶ C57-C61, C63-C65).

16.     Admitted to the extent that this means income from work.

17.     Denied.  This is a legal conclusion. *See* Plaintiff's Memo of Law at 14-16 and supporting exhibits cited therein.

18.     Denied.  This is a legal conclusion.  *See* Plaintiff's Memo of Law at 14-16 and supporting exhibits cited therein.

19.     This claim is withdrawn.

**B.     Plaintiff's Admissions And Denials To Defendant ACCB's Proposed Facts**

1.     Admitted

2.     Denied.   ACCB's corporate representative testified that he did not know if Plaintiff had a second lease.  (*See* Thomas Dreher's Dep. at 146:24-148:2, pages from Dreher's deposition cited herein are attached hereto as Exhibit 5).

3.     Denied.  Plaintiff testified that she "also sent them the proper notice of moving out." (*See* Exhibit 1 at 25:17-26:2 and Charlene Halicki's Dep. at 35:22-36:13, pages from Halicki's deposition cited herein are attached hereto as Exhibit 6).

4.     Denied.   Mrs. Dixon-Rollins testified that she paid her last month's rent. Additionally, Mrs. Dixon-Rollins recalls that at the beginning of her lease she paid a security deposit and her first and last month's rent.  (*See* Exhibit 1 at 25:12-26:21; Exhibit 5 at 150:25-151:16; and Exhibit 6 at 31:17-32:23).

5.      Admitted in part.  Denied in part.  It is admitted only that the landlord-tenant action against Mrs. Dixon-Rollins alleged charges for rent, late fees and an attorney fee.  Mrs. Dixon-Rollins denies that she left her apartment in a damaged condition.   Additionally, Defendants have offered differing stories as to what Mrs. Dixon-Rollins allegedly owed.  (*See* Exhibit 1 at 25:3-11; Exhibit 5 at 144:18-151:25; Exhibit 6 at 19:20-24:8, 31:17-32:23; and Christy Williams' Dep. at 67:8-23, pages from Williams' deposition cited herein are attached hereto as Exhibit 7).

6.      Denied.  (*See* PCSF at ¶¶ B4 & B5, *supra*).

7.      Admitted that a landlord tenant action was brought against Plaintiff.  Denied that Plaintiff owed the "balance" as characterized by ACCB.  (*See* PCSF at ¶¶ B4 & B5, *supra*).

8.      Admitted, to the extent this refers to the 2004 timeframe only.

9.      Admitted, to the extent this refers to the 2004 timeframe only.

10.     Admitted.

11.     Admitted.

12.     Denied.  The deposition pages ACCB cited do not support the proposition for which they are cited.  By way of further answer, Chancellor Properties, Inc. ("Chancellor") received a letter from its attorneys, Cohen and Willwerth, on November 1, 2004, enclosing a money order from Mrs. Dixon-Rollins in the settlement amount.  The letter properly identified the apartment and tenant at issue.  Chancellor applied the money order to Mrs. Dixon-Rollins' account and placed copies in the file for her apartment.  (*See* Exhibit 7 at 93:10-94:8).

13.     Admitted.

14.     Admitted.

15.     Admitted.

16.     Admitted.

17.     Admitted.

18      Admitted.

19.     Admitted.

20.     Admitted.

21.     Denied. (*See* Exhibit 5 at 196:17-20; Exhibit 8, Plaintiff's June 24, 2008 TU credit report at 1; and Exhibit 9, Plaintiff's August 12, 2008 TU credit report).

22.     Admitted.

23.     Admitted.

24.     Admitted.

25.     Admitted.

26.     Admitted.

27.     Admitted.

28.     Denied. ACCB deleted the account with Equifax but not with TU or Experian, as it was supposed to. (*See* Exhibit 5 at 119:19-120:20, 198:24-200:4).

29.     Admitted. By way of further answer, Mrs. Dixon-Rollins' payment was received by Chancellor Properties on November 1, 2004, and proof of payment was placed in the file for her apartment. (*See* Exhibit 7 at 93:10-94:8).

30.     Admitted in part. Denied in part. It is admitted that Mrs. Dixon-Rollins contacted ACCB on November 8, 2007 and that she was advised that, according to ACCB, she still owed the money. It is denied that there was no proof of payment. (*See* PCSF at ¶ B29, *supra*).

31.     Admitted.

32.     Admitted.

33.     Admitted.

34.     Admitted.  By way of further answer, ACCB began its "investigation" of Mrs. Dixon-Rollins' dispute and "verified" its reporting as accurate in the same minute.  Additionally, ACCB's president could not articulate any activities taken by ACCB during its investigation. (*See* Exhibit 5 at 207:22-208:2, 208:14-22).

35.     Admitted.

36.     Admitted.

37.     Admitted.

38.     Admitted.

39.     Admitted.

40.     Admitted.

41.     Admitted.

**C.     Plaintiff's Statement Of Additional Relevant Facts**

1.     Plaintiff Carmen Dixon-Rollins owes no money to her old landlord, Awbury Park Apartments.  (*See* Exhibit 1 at 25:12-26:21; Exhibit 7 at 92:20-94:3; Exhibit 10, October 18, 2004 Matthew Lipman letter to Cohen & Willwerth; and Exhibit 11, November 1, 2004 Cohen & Willwerth letter to Chancellor, enclosing money order for settlement amount).

2.     Plaintiff, a Philadelphia police officer, was sued by Awbury Park Apartments in 2004 for $1,163 supposedly for certain unpaid charges and penalties or for alleged damage to an

apartment that she rented.[1]  (*See* Exhibit 7 at 105:11-14; and Exhibit 12, June 14, 2004 Cohen & Willwerth letter to Carmen Dixon-Rollins).

3.    Plaintiff defended the underlying lawsuit and in October 2004 settled all claims with the landlord for $530.  (*See* Exhibits 9 and 10).

4.    The settlement was memorialized by counsel in that case in a letter dated October 18, 2004 and by a letter from Cohen & Willwerth to Chancellor on November 1, 2004.  (*See* Exhibits 9 and 10).

5.    Plaintiff paid Awbury Park as set forth in the settlement agreement using a money order for $531.  (*See* Exhibit 11; Exhibit 13, October 18, 2004 Matthew Lipman letter to Plaintiff; and Exhibit 14, copy of the cancelled money order).

6.    Plaintiff's payment was sent to Awbury Park by its attorneys, Cohen & Willwerth on November 1, 2004.  (*See* Exhibit 11; and Exhibit 7 at 92:12-94:8).

7.    Awbury Park deposited the money order, the money order cleared, and Plaintiff believed that the unfortunate landlord dispute was behind her.  (*See* Exhibit 14; and Exhibit 1 at 33:21-35:15).

---

[1]    The parties' accounts of what actually led to the underlying dispute with the landlord are highly contested, and no Defendant in this case has offered any coherent or creditable evidence showing that Plaintiff actually ever owed any money to the landlord.  For example, ACCB's 30(b)(6) witness, Thomas Dreher, testified that ACCB understood that Mrs. Dixon-Rollins had been evicted from her apartment in June 2004 and that $690 was owed for her last month's rent. (*See* Exhibit 5 at 144:25-146:6).  Chancellor Properties' 30(b)(6) witness, Christy Williams, stated that Mrs. Dixon-Rollins "moved out of her apartment without providing proper notice and without completing her renewal, the last term of her renewal."  Chancellor then brought suit against her for her last month's rent and associated fees.  (*See* Exhibit 7 at 103:11-107:20). The landlord-tenant lawsuit references damage to the apartment.  (*See* Exhibit 7 at 105:15-22). ACCB's records reference only "liquidated damages."  (*See* Exhibit 6 at 40:5-12 and Exhibit 5 at 149:4-151:25).

8.     But the landlord's rent collector and property management company, Defendant Chancellor, placed the alleged "debt" for collections with ACCB, for no appropriate reason and in violation of its own operating rules.[2]  (*See* Exhibit 7 at 65:17-22, 89:1-90:6).

9.     ACCB nevertheless attempted to re-collect the already paid debt and also reported it to the CRAs on Plaintiff's credit reports as a highly derogatory unpaid "collection" with a "$690 balance."  (*See* Exhibit 5 at 144:25-145:3; Exhibit 15, ACCB "work card"; Exhibit 16, Plaintiff's April 4, 2007 TU credit report; and Exhibit 17, Plaintiff's August 20, 2006 Experian credit report).

10.     Plaintiff discovered the obvious error and disputed it in early 2005.  (*See* Exhibit 15 and Exhibit 5 at 170:12-16; 174:18-175:1).

11.     The record in this case shows that in 2005, 2006, 2007, 2008 and 2009 Plaintiff disputed and re-disputed this collection account repeatedly with ACCB, TU, other CRAs, Chancellor and even with the Better Business Bureau.  (*See* Exhibits 21, 25, 29, 31, 34, *infra*, ACDVs regarding Plaintiff's credit reporting disputes; Exhibit 16; Exhibit 17; and Exhibit 18, November 8, 2007 Better Business Bureau to Plaintiff's husband, Maurice Rollins).

12.     On February 28, 2005, a collector from ACCB spoke to Plaintiff's husband and was told that the matter had been resolved in court.  (*See* Exhibit 5 at 170:12-16; 174:18-175:1).

13.     On March 31, 2005, a collector from ACCB spoke to Plaintiff's husband a second time and was told that Plaintiff's attorney, Matthew Lipman, Esquire, was working on the issue. (*See* Exhibit 5 at 175:2-10).

---

[2]     Chancellor's Rule 30(b)(6) witness testified in this case that no "debt" should have been placed with ACCB until Chancellor assisted the landlord to obtain a "judgment" against any given tenant.  (*See* Exhibit 7 at 65:17-22).  No judgment was ever obtained against Plaintiff.  (*See* Exhibit 7 at 89:1-90:6).

14.     On April 18, 2005, Plaintiff spoke to one of ACCB's collectors and advised ACCB that the debt was paid.  (*See* Exhibit 5 at 177:10-20).

15.     On May 16, 2005, ACCB's collector spoke to Plaintiff again and was advised that Plaintiff would fax a letter from her attorney.  (*See* Exhibit 5 at 178:15-179:6).

16.     On May 16, 2005, Plaintiff faxed a letter to ACCB with a copy of an April 6, 2005 letter from her attorney, Matthew Lipman, Esquire, to counsel for Awbury Park Apartments in the landlord-tenant matter.  In this letter, Mr. Lipman stated that the landlord-tenant matter was settled on October 18, 2004 and marked as withdrawn on the docket as of November 22, 2004.  (*See* Exhibit 5 at 178:24-180:11; Exhibit 15; and Exhibit 19, April 6, 2005 Matthew Lipman letter to Awbury Park).

17.     On May 24, 2005, ACCB received a letter by fax from Matthew Lipman.  Mr. Lipman enclosed a copy of the municipal docket showing the case against Mrs. Dixon-Rollins was dismissed.  (*See* Exhibit 20, May 24, 2005 Matthew Lipman letter to ACCB; and Exhibit 5 at 181:8-182:8).  Mr. Lipman's letter also stated that "Mrs. Dixon made full and final payment to Awbury Park.  Therefore, Mrs. Dixon owes no money to Awbury Park."  (*See* Exhibit 19).  Mr. Lipman also advised ACCB that "My client has advised you continuously that the debt has been paid and that no further funds are due."  (*See* Exhibit 19).  ACCB clearly understood Mr. Lipman's statements.  (*See* Exhibit 5 at 183:17-25).

18.     On August 22, 2006, ACCB received a dispute from Experian stating that the account had been paid prior to reporting to the credit bureau.  (*See* Exhibit 5 at 189:24-191:13 and Exhibit 21, Experian's August 20, 2006 ACDV with ACCB's 9/7/06 response).  ACCB verified the account as reported within the same minute that the dispute was entered in ACCB's work log. (*See* Exhibit 15 and Exhibit 5 at 193:10-19).  ACCB has no record that it conducted

any investigation into the August 22, 2006 dispute. (*See* Exhibit 5 at 196:6-12). Despite its failure to investigate, ACCB verified the account as accurate with money owing. (*See* Exhibit 21; Exhibit 5 at 196:13-16; and Exhibit 23, Experian's September 25, 2006 investigation results).

19.     On May 8, 2007, Plaintiff disputed the ACCB account by letter to TU. (*See* Steven Newnom's Deposition at 26:2-27:8, pages from Newnom's deposition cited herein are attached hereto as Exhibit 22; and Exhibit 24, Plaintiff's May 8, 2007 dispute letter). TU understood Plaintiff's dispute of the ACCB account was "that the actual balance was paid in full by money order prior to being reported to the creditors." (*See* Exhibit 22 at 27:19-24). TU did not send Mrs. Dixon-Rollins' letter to ACCB, rather it notified ACCB of the dispute through the automated ACDV process. (*See* Exhibit 22 at 33:12-34:19). There was no communication between TU and ACCB other than the ACDV form. (*See* Exhibit 22 at 35:9-12).

20.     Mrs. Dixon-Rollins' May 8, 2007 dispute letter also provided TU with the name, address and phone number for her attorney in the landlord-tenant matter, Matthew Lipman. (*See* Exhibit 24 and Exhibit 22 at 35:13-20). Despite having this information, TU never contacted Mr. Lipman.

```
21     Q.  Did TransUnion ever contact Mr. Lipman
22   concerning this 5/8/07 dispute from
23   Ms. Dixon-Rollins?
24     A.  No, we did not.
                                              36
 1     Q.  Never called him?
 2     A.  No.
 3     Q.  Never wrote to him?
 4     A.  No.
 5     Q.  Despite the fact that you've been provided
 6   with the phone number and his address.
 7           MR. LUCKMAN:  Object to the form.
 8           THE WITNESS:  We never contacted
 9       him, no.
```

(*See* Exhibit 22 at 35:21-36:9).

21.     On May 14, 2007, ACCB received Mrs. Dixon-Rollins' dispute from TU at 10:00 a.m. and verified the account as accurate as reported within the same minute.  (*See* Exhibit 5 at 196:21-197:4 and Exhibit 15).  ACCB did nothing to investigate Mrs. Dixon-Rollins' disputes. (*See* Exhibit 5 at 197:5-22).  Despite its failure to investigate, ACCB verified the account as accurate with money owing.  (*See* Exhibit 25, ACCB's 5/14/07 ACDV and Exhibit 26, TU's May 15, 2007 investigation results).

22.     On May 21, 2007, ACCB received a dispute from Equifax concerning the ACCB account reporting on Mrs. Dixon-Rollins' credit report.  In response to this dispute ACCB deleted the account.  (*See* Exhibit 5 at 198:2-14, 199:5-17).

23.     ACCB's corporate practice is to delete an account from all three credit bureaus when it deletes an account from one credit bureau.  (*See* Exhibit 22 at 120:11-20).  ACCB did not delete the account from TU and Experian at the time it deleted the account from Equifax in May 2007.  (*See* Exhibit 5 at 200:2-4; Exhibit 25; and Exhibit 27, Experian's May 24, 2007 investigation results).

24.     On December 12, 2007, Mrs. Dixon-Rollins wrote a letter to TU disputing the ACCB account and enclosing supporting documents, including a list of people who had information about her dispute and their contact information.  (*See* Exhibit 28, Plaintiff's December 12, 2007 dispute letter and Exhibit 22 at 40:15-41:16).  TU did not contact anyone on this list and did not provide the list to ACCB.  (*See* Exhibit 22 at 47:16-48:17).  TU verified the ACCB account as accurate based on a January 8, 2008 ACDV form.  (*See* Exhibit 29, ACCB's January 8, 2008 ACDV and Exhibit 22 at 51:22-52:2).  At this time, the ACCB account was the only negative account on Mrs. Dixon-Rollins' TU credit report.  (*See* Exhibit 30, TU's January 9, 2008 investigation results and Exhibit 22 at 56:20-24).

25.     On January 8, 2008, ACCB received a dispute from TU concerning Mrs. Dixon-Rollins and entered the dispute into its work log.  ACCB verified the accuracy of the account within the same minute that it received the dispute.  (*See* Exhibit 15 and Exhibit 5 at 200:8-17).

26.     Despite the inconsistency between Mrs. Dixon-Rollins' disputes and ACCB's ACDV response, TU verified the ACCB account as being accurate and did not take any steps to reconcile the difference between their respective positions.  (*See* Exhibit 22 at 52:13-54:11).  The sole basis for TU's continued reporting of the ACCB account with a $690 unpaid balance was the ACDV response from ACCB.  (*See* Exhibit 22 at 54:13-55:4).

27.     On January 10, 2008, ACCB received a dispute from Experian concerning Mrs. Dixon-Rollins and entered the dispute into its work log.  ACCB verified the accuracy of the account within the same minute that it received the dispute.  (*See* Exhibit 15; Exhibit 5 at 201:5-13; Exhibit 31, ACCB's January 10, 2008 ACDV; and Exhibit 32, Experian's January 11, 2008 investigation results).

28.     On May 28, 2008, TU received an automated dispute from First Advantage Credco, a reseller of information, on behalf of Mrs. Dixon-Rollins concerning the ACCB account. (*See* Exhibit 22 at 58:11-24 and Exhibit 33, 5/28/08 Reseller Dispute).  In response to this dispute, TU received an ACDV from ACCB verifying the account as accurate. (*See* Exhibit 8; Exhibit 22 at 73:14-74:3; and Exhibit 34, ACCB's June 23, 2008 ACDV).

29.     On May 28, 2008, TU received by fax from First Advantage Credco a letter from Mrs. Dixon-Rollins dated May 22, 2008 disputing the ACCB account and enclosing supporting documents. (*See* Exhibit 22 at 61:17-62:11 and Exhibit 35, 5/28/08 Reseller fax with Plaintiff's May 22, 2008 letter).  TU treated this letter as a separate dispute from the automated dispute that it received from Credco on May 28, 2008 because it was received in a different form (fax) and at

a different time than the automated dispute. (*See* Exhibit 22 at 70:13-73:7). TU interpreted this dispute to relate to an account with Chancellor Properties and wrote to Credco on May 30, 2008 to advise that the account was not reporting on Mrs. Dixon-Rollins' credit report. No further investigation of this dispute was performed by TU. (*See* Exhibit 36, TU's May 30, 2008 letter to Credco and Exhibit 22 at 70:1-12).

30. On June 23, 2008, ACCB received a dispute from TU concerning Mrs. Dixon-Rollins and entered the dispute into its work log. ACCB verified the accuracy of the account within the same minute that it received the dispute. (*See* Exhibit 5 at 201:14-23 and Exhibit 8).

31. On July 28, 2008, Mrs. Dixon-Rollins wrote a letter to TU disputing the ACCB account and enclosing supporting documents including the cancelled money order used to pay Awbury Park Apartments. (*See* Exhibit 37, Plaintiff's July 28, 2008 dispute letter and Exhibit 22 at 78:14-79:14). As part of its investigation, TU did not contact any of the persons referenced in the supporting documents to Mrs. Dixon-Rollins' letter. (*See* Exhibit 22 at 80:5-12). As part of its investigation, TU did not contact Integrated Payment Systems, the issuer of the money order. (*See* Exhibit 22 at 80:13-19). TU never performed an investigation into the 7/28/08 dispute on Mrs. Dixon-Rollins' file because TU opened the dispute under the file of another consumer, Carmen A. Rollins. (*See* Exhibit 22 at 93:22-94:6, 95:4-96:7). As a result, TU sent Mrs. Dixon-Rollins a letter falsely stating that "the information that you disputed does not currently appear on your TransUnion credit report." (*See* Exhibit 38, TU's July 31, 2008 investigation results and Exhibit 22 at 86:18-87:9).

32. The Defendants filing the present motions received notice of this dispute nineteen times. According to Defendants' own records, notice was received four (4) times to TU (on 5/8/07, 12/12/07, 5/28/08, and 7/28/08) and fifteen (15) times to ACCB (on 2/28/05, 3/21/05,

3/31/05, 4/18/05, 5/16/05, 5/24/05, 5/31/05, 8/20/06, 5/14/07, 5/21/07, 11/8/07, 1/8/08, 1/10/08, 6/23/08 and 4/7/09).   (See Exhibits 15, 20, 21, 24-25, 28-29, 31, 33-34, 37; Exhibit 22 at 26:2-27:8, 40:15-41:16, 58:11-24, 61:17-62:11, 78:14-79:14).

33.     Mrs. Dixon-Rollins even had her former attorney, Matthew Lipman, Esquire, contact ACCB to inform them that the debt was paid. (*See* Exhibit 5 at 179:7- 180:11).

34.     ACCB's website proclaims that it always works "in complete compliance with state and federal laws including the Fair Debt Collection Practices Act and the Fair Credit Reporting Act."  (*See* Exhibit 5 at 141:23-142:9 and Exhibit 39, a print-out of ACCB's website). ACCB has never received an opinion from the FTC or any other governmental or administrative agency that it always operates in compliance with these laws.  (*See* Exhibit 5 at 142:24-143:4). ACCB has never received an opinion from any attorney or law firm that it always operates in compliance with these laws.  (*See* Exhibit 5 at 143:5-9).  ACCB has never received an opinion from any court that it always operates in compliance with these laws.  (*See* Exhibit 5 at 142:19-23).  ACCB has been sued under both the FDCPA and FCRA but considers these suits illegitimate and a nuisance.  (*See* Exhibit 5 at 143:10-21).

35.     Mrs. Dixon-Rollins received calls from debt collectors at ACCB, who told her that "the letter from your attorney means nothing to me."  (*See* Exhibit 1 at 112:3-113:22 and Exhibit 40, November 8, 2007 Plaintiff letter to Christy Williams at Chancellor).

36.     Repeatedly both ACCB and TU "verified" the collection account as accurate, with Plaintiff allegedly still owing "$690."  (*See* Exhibits 26, 30, 36, 38; Exhibit 22 at 37:8-18, 54:3-55:5, 73:20-74:3; and Exhibit 5 at 203:13-20).

37.     Defendants simply parroted the inaccurate records that led to the error in the first place.  (*See* Exhibit 22 at 77:7-23; 98:7-100:15 and ACCB's Memo of Law at 14).

38.     Neither TU nor ACCB contacted Plaintiff or her husband for any information concerning the disputed ACCB account.  (*See* Exhibit 22 at 80:5-12 and Exhibit 5 at 210:9-18).

39.     Neither TU nor ACCB contacted the attorneys involved in the underlying landlord-tenant dispute despite having been provided with the attorneys' addresses and phone numbers.  (*See* Exhibit 22 at 35:13-24, 47:16-48:3, 78:14-80:12 and Exhibit 5 at 210:19-23).

40.     Neither TU nor ACCB contacted Awbury Park Apartments or any third party for information concerning Plaintiff's disputes.  (*See* Exhibit 22 at 80:21-81:6 and Exhibit 5 at 210:9-213:4)

41.     Neither TU nor ACCB searched for the money order or any record of payment. (*See* Exhibit 22 at 80:13-19 and Exhibit 5 at 212:7-213:4).

42.     Neither TU nor ACCB ever attempted to contact any court concerning Plaintiff's disputes despite having been informed by Plaintiff that the underlying lawsuit settled before a court hearing.   (*See* Exhibit 22 at 55:6-16 and Exhibit 5 at 212:1-6).

43.     TU never forwarded any document that Plaintiff provided in support of her disputes to ACCB.  (*See* Exhibit 22 at 34:22-35:7, 48:4-13, 81:7-11).

44.     TU has a policy that it never forwards the documents sent to it in support of a consumer's dispute to the furnisher.  (*See* Steve Newnom's Deposition in *Grover v. Trans Union, LLC, et al.*, E.D. Pa. Civ. No. 08-0551 at 101:2-104:19, pages from Newnom's deposition in *Grover* cited herein are attached hereto as Exhibit 41).

45.     TU never contacted Chancellor's Director of Property Management, Christy Williams concerning Plaintiff's disputes despite having been provided with her contact information. (*See* Exhibit 22 at 44:3-6, 63:6-9, 78:14-80:12).

46. TU never attempted to reconcile the inconsistency between Plaintiff's claims that she had paid the debt and ACCB's verification that Plaintiff owed $690. (*See* Exhibit 22 at 52:13-53:18).

47. According to its policies and procedures, all work performed by ACCB's employees during a credit bureau investigation was recorded on the "work card."

> 25    Q    According to the policies and practices of
> 130
> 1    your company whatever is done in connection with an
> 2    investigation into a credit bureau dispute is supposed
> 3    to be memorialized on the work card?
> 4    A    Yes.

(Exhibit 5 at 129:25-130:4).

48. ACCB's work card for Mrs. Dixon-Rollins' account contained all the information for her account.

> 9    Q    Right. When we saw a work card for the
> 10    disputed account that Mrs. Dixon-Rollins was disputing
> 11    that is the work card that has all the information for
> 12    that account. Correct?
> 13    A    Yes.

(Exhibit 5 at 130:9-13).

49. Defendants "investigated" the repeated credit disputes by *not* interviewing or speaking with *a single* person, and by *not* unearthing or even searching for *any* documents.

> 13    Q    Sir, isn't it true that with respect to the
> 14    credit bureau disputes there is not any information or
> 15    any notation in any of your records that anybody at your
> 16    company spoke to a single person or looked at a single
> 17    document in conducting an investigation?
> 18    A    There's nothing notated on the work card.

(Exhibit 5 at 214:13-18). (*See also* Exhibit 5 at 196:10-20, 210:9-213:4 and Exhibit 22 at 35:13-24, 47:16-48:3, 55:6-16, 78:14-80:19).

50. ACCB has no record showing that it performed any investigation into Mrs. Dixon-Rollins' credit bureau disputes.

> 14    Q    Okay.  With respect to the Dixon-Rollins
> 15 disputed account does your company have any notes, any
> 16 records, any information that it did any investigation
> 17 with respect to the credit bureau disputes that we just
> 18 went over?
> 19    A    I can only go by what the work card says.
> 20    Q    And the work card says what?  What did your
> 21 company do?
> 22    A    Nothing's mentioned about what it did.

(Exhibit 5 at 208:14-22).

51. ACCB's records show that it opened its "investigation into Plaintiff's disputes and verified the information that it was reporting in the same minute.

> 22    Q    Sir, I'm not trying to be tricky here, but we
> 23 went through every single one of these disputes and
> 24 there was an entry of the dispute and in the exact same
> 25 minute a verified as reported response.  Did you see
>
>                                        208
> 1 anything in between as to what was done?
> 2    A    No.

(Exhibit 5 at 207:22-208:2).  (*See also* Exhibit 5 at 214:19-23).

52. Even when Plaintiff provided proof of the payment to them and relevant contact information for all parties and counsel involved in the landlord-tenant dispute, these Defendants ignored it.  (*See* Exhibit 22 at 35:13-24, 47:16-48:3, 55:6-16, 78:14-80:19 and Exhibit 5 at 210:19-23).

53. ACCB continued to report the account on Mrs. Dixon-Rollins' Experian and TU credit reports until April and May 2009, respectively.  (*See* Exhibit 42, ACCB's April 8, 2009 ACDV to Experian and Exhibit 43, TU's May 11, 2009 investigation results).

54.     Defense records show that they intended to continue to report this highly derogatory collection item for seven (7) years.   (*See* Exhibits 8, 26, 30, 38).

55.     For the two years prior to filing this lawsuit (the statute of limitations period), Plaintiff's credit had only one "adverse" or "derogatory" account -- the collection item that is the subject of this lawsuit.  (*See* Exhibits 8, 16, 26-27, 30, 32, 38; Exhibit 22 at 30:12-32:2, 40:9-14, 56:20-24, 64:4-17, 96:13-98:2; and Exhibit 3 at 8:14-22, 124:8-125:3).

56.     The account was sometimes double-reporting as both a Chancellor account and an ACCB account.  (*See* Exhibits 17, 23, 27 and Exhibit 3 at 55:1-4).

57.     The ACCB account always reported in derogatory status and with a balance of $690.  (*See* PCSF at ¶¶ C36-C53, *supra*).

58.     When Plaintiff needed credit, she has been denied, delayed or offered exceedingly high interest rates.   Particularly frustrating for Plaintiff was her inability to get affordable financing to replace her windows, as Mrs. Dixon-Rollins described it:

```
 8  Q.      What needed to be done to the
 9  windows?
10  A.      They needed replacement.
11  Q.      How old is the house?
12  A.      I don't know.  It's old.  I know
13  the windows don't open.  Some of the windows
14  don't open.
15  Q.      Are they leaky, or they just don't
16  open?
17  A.      I know they don't -- some don't
18  open.  Some you could feel the whole winter.
19  They just...
20  Q.      The shades blow in the winter?
21  A.      There is no storm up.  They're
22  just...
```

(Exhibit 1 at 45:8-22).

59.     For the two years prior to filing this lawsuit, Plaintiff has presented evidence that she was denied a personal loan to replace her leaky windows through Wells Fargo on November 24, 2008 and Capital One Home Improvement Finance on November 20, 2008, was offered an unaffordable 12.9% APR loan for the same transaction by FCC Financing on December 1, 2008, had to accept a 23% interest loan through CitiFinancial on August 14, 2007, and was charged a 0.5% higher interest rate on her present mortgage by Gateway Funding in the early part of 2009 due to this single supposedly unpaid blemish on her credit record.  (*See* Exhibit 1 at 37:23-38:13, 97:23-98:7, 98:21-99:18; Exhibit 4; Exhibit 44, November 20, 2008 Capital One Home Finance denial letter; Exhibit 45, August 14, 2007 CitiFinancial note; Exhibit 46, December 1, 2008 FCC Financing loan document; and Exhibit 47, February 10, 2009 Uniform Residential Loan Application).

60.     All of these adverse credit actions were taken because of TU credit reports sold to the various potential creditors, with the ACCB account reporting as the only derogatory credit item in Plaintiff's credit report.  (*See* Exhibit 48, Plaintiff's January 26, 2009 TU credit report at pp. 4-8 listing inquiries and Exhibit 22 at 30:16-32:2, 40:9-14, 56:20-24, 64:4-17, 96:22-98:2). TU sold Mrs. Dixon-Rollins' credit report containing the inaccurate ACCB account to CitiFinancial on August 14, 2007 (*See* Exhibit 48 at p. 4).  TU sold Mrs. Dixon-Rollins' credit report containing the inaccurate ACCB account to Wells Fargo on November 18, 2008.  (*See* Exhibit 48 at p. 4 and Exhibit 4).  TU sold Mrs. Dixon-Rollins' credit report containing the inaccurate ACCB account to Capital One NA on November 20, 2008.  (*See* Exhibit 49 at p. 4 and Exhibit 44).  TU sold Mrs. Dixon-Rollins' credit report containing the inaccurate ACCB account to FCC Financing on November 24, 2008.  (*See* Exhibit 48 at p. 4 and Exhibit 46).  TU

sold Mrs. Dixon-Rollins' credit report containing the inaccurate ACCB account to Gateway Funding on November 20, 2008. (*See* Exhibit 48 at p. 4).

61.    The Gateway Funding branch manager who processed Plaintiff's loan testified that Plaintiff's poor credit score disqualified her from competitive "conventional" mortgages, and even though he was able to offer Plaintiff an FHA home loan, that loan was 0.5% more expensive than it otherwise would have been *because* the ACCB collection account reflected an unpaid balance of $690.

> 22  Q.      Am I correct that if this collection
> 23  account stemming from the Awbury Park Apartments
> 24  didn't show a $690 outstanding balance you would
>                             124
>  1  not have needed to do the extra work that you put
>  2  into it?
>  3  A.      Correct.
>  4  Q.      And because you needed to do the extra
>  5  work, that's why she got five-and-a-half percent on
>  6  the loan instead of five?
>  7  A.      Correct.

(Exhibit 3 at 123:22-124:7).  (*See also* Exhibit 3 at 8:14-25, 39:20-40:9).

62.    Plaintiff has further offered an unrebutted expert report that her credit losses were caused by this inaccurate collection item, that the inaccurate collection item prevented Plaintiff from obtaining a mortgage loan that could have been 0.75% to 0.9% lower than the loan Gateway Funding was able to give her, and further that Plaintiff's financial losses as to the mortgage alone are in the range of $46,700 to $58,500.  (*See* Exhibit 49, Tomas Norton's Expert Report and Exhibit 2 at 202:17-204:2)

63.    Plaintiff also offers detailed evidence and seeks damages for the other lost credit opportunities (such as with Wells Fargo, Capital One Home Improvement Finance, FCC Financing and CitiFinancial) and for the untold frustration, embarrassment, and related

emotional distress that she suffered at the hands of these Defendants for a prolonged period of time.  (*See* PCSF at ¶¶ C57-C58 *supra*; Exhibit 50, Plaintiff's Objections and Responses to TU Interrogatory Nos. 6 and 6e, and ACCB Interrogatory No. 2; and Exhibit 41).

64.     TU has sold Mrs. Dixon-Rollins' credit report containing the inaccurate ACCB account to her existing and prospective creditors at least sixty-three times including sales to Gateway Funding (1/20/08), FCC Finance LLC (11/24/08), Capital One NA (11/20/08), Power Windows and Siding (11/18/08, 11/17/08), Wells Fargo (11/18/08), CitiBank SD NA (8/26/08, 8/12/08), CitiFinancial (8/6/08, 8/14/07), GMAC (7/17/08), John F. Kennedy Chevrolet (7/15/08), First USA NA (2/12/07), My Choice Medical (1/29/07), First Premier (9/08), Advanced Financial Services (7/08, 4/08), Citi Cards CBSD (7/08, 6/08, 5/08, 4/08, 3/09, 2/08, 1/08), Direct Lending Source (7/08), Amica Insurance (6/08, 5/08, 1/08), Residential Finance Corp (6/08), Barclays Bank Deleware (2/08), CitiFinancial (4/08), Prime Lending (4/08, 3/08), Washington Mutual/Providian (4/08, 2/08), American General Finance (3/08, 1/08), Bank of America (3/08, 2/08, 1/08), Service Protection Direc (3/08), The Travelers Companies (3/08), AIG (2/08), HSBC Bank NV (2/08), Discover Financial (1/08), Credco (1/09,11/08, 9/08, 8/08, 7/08), Capital One Bank USA NA (4/09), Chase ID Protection via Credco (12/08, 9/08, 7/08, 6/08, 5/08), Cavalry Portfolio (7/08), T-Mobile (7/08), Chex Systems (6/08), Travelers Insurance (5/08, 10/07), Tenet HealthCare (4/08), AllState Valley Forge (2/08), St. Christopher's Hospital (1/08), Encompass (10/07), and Unitrin Direct (7/07).  (*See* Exhibit 48 at pp. 4-8).

65.     Further, as she put in her dispute letters through the years, this false reporting has negatively affected her "credibility and character" and has been "truly embarrassing and unfair." (*See* Exhibit 28).

66.     Further, Mrs. Dixon-Rollins' dispute letters express "how frustrating and degrading" dealing with this inaccurate reporting made her feel.  (*See* Exhibit 41).  She also noted her credit score "went [from] close to 700 to 516 due to this unwarranted credit assassination."  (*See* Exhibit 41).  Mrs. Dixon-Rollins then expressed her frustration at the fact that the inaccurate reporting of the ACCB account "continues to do nothing but cause financial turmoil for myself and my family."  (*See* Exhibit 41).

67.     On July 28, 2008, Mrs. Dixon-Rollins was still trying to resolve the inaccurate reporting of the ACCB account on her TU and Experian reports.  She wrote to Christy Williams and expressed her growing frustration – "I have been fighting this fight for 4 years."  (*See* Exhibit 37).

68.     After she repeatedly hit a "brick wall," Plaintiff brought this lawsuit. (*See* Exhibit 28).

**FRANCIS & MAILMAN, P.C.**

  */s/ John Soumilas*
JOHN SOUMILAS
GEOFFREY H. BASKERVILLE
Attorneys for Plaintiff
Land Title Building, 19th Floor
100 South Broad Street
Philadelphia, PA 19110
DATE: December 18, 2009                    (215) 735-8600