# EXHIBIT 5



# Compressed Transcript of the Testimony of
# **TOM DREHER, 10/1/09**

**Case:** Dixon-Rollins v. Experian Information Solutions, et al.

Summit Court Reporting, Inc.
Phone: 215.985.2400
Fax: 215.985.2420
Email: depo@summitreporting.com
Internet: www.summitreporting.com

Case 2:09-cv-00646-TJS   Document 45-9   Filed 12/18/09   Page 3 of 22

Dixon-Rollins v. Experian Information Solutions, et al.                    TOM DREHER, 10/1/09

Page 73

1   different building. To find out who was all tied
2   together. The agreement for collection tells me who the
3   properties are tied to the property management company.
4   We don't wish for anybody to know anything beyond that.
5   So our collectors don't have a reason to know that we're
6   working for ten properties or one.
7       Q   I understand that, I think. Let's put aside
8   any particular property management company. In total --
9   in total, do you know how many accounts are placed for
10  collection with ACCB by all of your clients?
11      A   What period?
12      Q   Let's say this year, how many accounts do you
13  have for collection right now?
14      A   Approximately 20 to 25,000.
15      Q   Over the course of a year like 2008, last
16  year?
17      A   Like -- like a twelve-month period?
18      Q   A 12-month period such as 2008 last year, how
19  many total accounts would your company have that it's
20  working up in some fashion or another to try to collect
21  money on?
22      A   Twenty to 24,000.
23      Q   Am I correct, sir, that your company works on
24  a contingency fee basis?
25      A   Yes.

Page 74

1       Q   In other words, your company doesn't get paid
2   unless it actually collects money. Correct?
3       A   Correct.
4       Q   So if we take an example Chancellor they
5   place ten accounts with you, they won't pay you anything
6   unless you actually collect money on those accounts.
7   Correct?
8       A   Yes.
9       Q   What percentage do you get to keep if you
10  collect money?
11      A   Approximately 30 to 37 percent.
12      Q   Has ACCB ever turned down a client because
13  they just will not provide enough information about the
14  debts that are allegedly owed?
15      A   Yes, if you can't back up.
16      Q   How many total clients does ACCB presently
17  have?
18      A   I'm unsure.
19      Q   Would you say over 10,000?
20      A   Certainly, no.
21      Q   Would you say its over 5,000?
22      A   I'm unsure. Because there's -- clients are
23  coming. Clients are going. As I said, in the apartment
24  business a lot of my business comes from property
25  management companies and their contract ends and they

Page 75

1   stop using my service.
2       Q   I understand that business is always flowing,
3   sir. But could you estimate without guessing how many
4   clients your company has?
5       A   No, I could not any longer.
6       Q   Okay. Was there a period of time that in
7   your capacity as president you knew how many clients
8   your company had?
9       A   I'm unsure.
10      Q   Did you ever know?
11      A   On an accurate basis, no.
12      Q   Okay. How many clients did your firm turn
13  down within this year 2009, we're now in October,
14  because they did not provide sufficient information to
15  back up the debt that they were sending to you for
16  collection?
17      A   I don't know.
18      Q   Anybody?
19      A   Sure.
20      Q   Anybody come to mind? Could you tell me one?
21      A   No, they're in actual banker boxes sitting
22  there waiting for someone to cooperate and give us the
23  back-up information. Without that we won't work for
24  them.
25      Q   I'm not asking about the process where you're

Page 76

1   waiting for the back up. I'm asking about a client that
2   you said we're not no longer going to do business with
3   you, we won't collect for you because you don't give us
4   enough information to know that a debt is actually owed.
5       A   I'm unsure.
6       Q   Okay. Could you remember the name of any?
7       MR. PERR: Do you need paper?
8       THE WITNESS: I'm just trying to calculate
9   something. I can't even think. My mind is a
10  blank. I'm unsure.
11  BY MR. SOUMILAS:
12      Q   Well, if you think of one, would you let me
13  know?
14      A   Okay.
15      Q   Does your company as a matter of its routine
16  business report collection accounts to the national
17  credit bureaus Equifax, Experian and Trans Union?
18      A   Yes.
19      Q   Does it report to all three?
20      A   Yes.
21      Q   All accounts?
22      A   There are some parameters that would -- would
23  warrant not doing that. And that changes by the credit
24  reporting industry about 75 to $100 account, cannot be
25  any lower than that, they won't coll -- they won't put

19  (Pages 73 to 76)

Dixon-Rollins v. Experian Information Solutions, et al.

TOM DREHER, 10/1/09

---

**Page 77**

1    the account in a credit bureau file. There's a number
2    of rules, I can't tell you off the top of my head, that
3    the credit reporting company has.
4        Q    Does your company ask permission of its
5    clients before it places accounts on -- with the
6    national credit bureaus?
7        A    Yes.
8        Q    And is that permission memorialized some
9    place?
10       A    Yes.
11       Q    Where would that be memorialized?
12       A    Agreement for collection.
13       Q    Okay. Do all the agreements for collection
14   ask for permission to have the accounts placed with the
15   national credit bureaus?
16       A    Yes.
17       Q    Why would your company want to place
18   collection accounts with the national credit bureaus?
19       A    There's too many reasons to list. Probably
20   the biggest is that the change in circumstance within
21   the consumer with time passing that they may be able to
22   take responsibility of a bill two years later they
23   couldn't do at the time.
24       Q    Would you agree with me that once an account
25   is placed with a credit bureau, your company could look

**Page 78**

1    at that consumer's credit report to see how their
2    circumstances might change?
3        A    No. You have to pay a fee for it.
4        Q    After you pay the fee, do you get to look at
5    the credit report?
6        A    No, I don't think you understand. There's no
7    cost to place the account in the credit file. For me to
8    do any activity, like any other credit grantor, I have
9    to pay something for that.
10       Q    Okay. I'm sorry. I want to be clear. You
11   told me that as circumstances change with a debtor that
12   might improve your company's chances of collecting a
13   debt. Correct?
14       A    Yes.
15       Q    And do you use the credit bureaus as a source
16   of learning whether circumstances are changing with a
17   debtor?
18       A    Yes, but normally it's more the consumer has
19   the change and contacts us because the account is on the
20   credit profile.
21       Q    Oh, I see. So the -- you place the account
22   on the credit bureau file to urge the consumer to
23   contact you about the debt. Correct?
24       A    Yes.
25       Q    Would you agree with me that placing an

**Page 79**

1    account on a credit bureau file with the national credit
2    bureaus is a form of collection activity?
3            MR. PERR: I'm going to object to the form of
4        the question to the extent that it's asking for a
5        legal opinion.
6            THE WITNESS: I don't have an answer, I --
7    BY MR. SOUMILAS:
8        Q    Does your company do it as a matter of
9    practice in aid of collecting on that debt?
10       A    That's one aspect, yes.
11       Q    And would you agree with me that whenever one
12   of your accounts is placed with the national credit
13   bureaus, it's always a collection account. Correct?
14       A    Yes.
15       Q    You understand that to be a derogatory
16   account. Correct?
17       A    When it's placed in a collection bureau file
18   would be derogatory, yes.
19       Q    Consumers who have accounts with your company
20   they don't consider those to be good accounts. Those
21   are derogatory accounts? You would agree with that
22   statement?
23       A    Who feels that way?
24       Q    Let's strike the who feels part.
25            Collection accounts with ACCB are never

**Page 80**

1    positive credit accounts. They are always derogatory
2    accounts. Correct?
3        A    I'm not in the extension of credit business,
4    so I can't be an expert as to how someone sees it
5    outside my operation.
6        Q    Well, I know you're not an expert, sir. But
7    as the president of a collection company, is it your
8    understanding that these collection accounts that are
9    placed with the national credit bureaus are accounts
10   that are derogatory in nature or accounts that actually
11   help the consumer's credit standing?
12           MR. PERR: I object to the form of the
13       question.
14   BY MR. SOUMILAS:
15       Q    Could you answer that?
16       A    I can't. I'm not an expert. I can't tell
17   you.
18       Q    I'm not asking you if you're an expert. I'm
19   just asking you as the president of your company do you
20   have any judgment on that? Do you think the accounts
21   are derogatory or could they be helpful? If you don't
22   know, you don't know?
23       A    I call it a collection account. I don't call
24   it a derogatory account.
25       Q    Do you think that a collection account is an

Case 2:09-cv-00646-TJS  Document 45-9  Filed 12/18/09  Page 5 of 22

Dixon-Rollins v. Experian Information Solutions, et al.                    TOM DREHER, 10/1/09

Page 109

1   back to the credit bureaus through the e-OSCAR system as
2   to what should be done with that account?
3       A   Yes.
4       Q   And am I correct that the e-OSCAR system
5   allows ACCB to delete an account that should not be
6   reporting as to that consumer?
7       A   To my understanding, yes.
8       Q   Does the e-OSCAR system also allow your
9   company to verify that an account is accurate and should
10  stay the way it is?
11      A   To my understanding, yes.
12      Q   And does the e-OSCAR system also allow you to
13  modify an account if some changes need to be made?
14      A   It's my understanding, yes.
15      Q   You've heard the term verified as reported
16  within your company?
17      A   Yes.
18      Q   Does that mean that the account is accurate
19  in all respects and that it should stay on just the way
20  it is?
21      A   To the best of my knowledge, yes.
22      Q   All right. And how long has Dawn Eddy been
23  responsible for handling these type of e-OSCAR disputes?
24      A   She's worked for us for approximately one
25  year.

Page 110

1       Q   How long has she been responsible for
2   handling the e-OSCAR credit bureau disputes?
3       A   I'm unsure.
4       Q   Was it -- has it been more than a year or
5   less -- couldn't be more than a year, she's only been
6   with you for a year. Has it been the whole year or just
7   recently?
8       A   I'm unsure.
9       Q   Okay. But do you know when she joined the
10  company?
11      A   I believe it was either September or October,
12  2008.
13      Q   Is she the receptionist?
14      A   Yes.
15      Q   Okay. What duties does she have as a
16  receptionist? Answering the phones, opening the mail,
17  those type of basic receptionist duties?
18      A   Yes.
19      Q   When somebody comes to visit to set up the
20  appointment, et cetera?
21      A   That's not done normally.
22      Q   Okay. Is there any other receptionist at
23  your company other than Ms. Eddy?
24      A   No. We have a backup system with various
25  people on the floor who pick up the calls.

Page 111

1       Q   Okay. Does Ms. Eddy do the credit bureau
2   investigations through the e-OSCAR system right at her
3   receptionist's desk?
4       A   To the best of my knowledge.
5       Q   Okay. Nobody else at your company over the
6   last year or so has responsibility for doing credit
7   bureau disputes through e-OSCAR. Correct?
8       A   Either her or Tina.
9       Q   Tina you told me has some different job.
10  Correct?
11      A   None of these are full-time 40-hour work week
12  type responsibilities.
13      Q   All right. We'll get to that in a moment.
14  How many hours a week does Ms. Eddy or Eddy,
15  excuse me, work for your company?
16      A   Talking about total number of hours worked?
17      Q   Per week, yes.
18      A   40.
19      Q   How many -- so she is a full-time employee?
20      A   Yes.
21      Q   How many hours during a 40-hour work week
22  would she devote to handling credit bureau disputes as
23  opposed to her receptionist duties?
24      A   I'm unsure.
25      Q   How many e-OSCAR credit bureau disputes does

Page 112

1   your company receive in any given week?
2       A   I'm unsure.
3       Q   You use the term unsure. Do you have an
4   approximation without guessing as to how many --
5       A   No, I do not.
6           MR. PERR:  Let him finish.
7   BY MR. SOUMILAS:
8       Q   As the president of ACCB did you ever know
9   how many credit bureau disputes the company receives?
10      A   No.
11      Q   Is it your testimony, sir, that it is one
12  person's job to deal with the e-OSCAR credit bureau
13  disputes?
14      A   No.
15      Q   You told me that Ms. Eddy is the only person
16  that deals with the e-OSCAR disputes, did you not,
17  presently?
18      A   She and Tina share that responsibility.
19      Q   Okay. So Tina also does e-OSCAR?
20      A   Yes.
21      Q   Yes?
22      A   Yes, all my employees do various tasks and
23  that's just some of the tasks, yes.
24      Q   Okay. Do other employees in addition to Dawn
25  Eddy and Tina Votava also deal with e-OSCAR disputes?

28  (Pages 109 to 112)

Dixon-Rollins v. Experian Information Solutions, et al.                    TOM DREHER, 10/1/09

Page 117

1    Q    Oh.
2    A    I'm not aware. I'm not knowledgeable, no.
3    Q    Okay.
4    A    I've not asked the question before.
5    Q    Okay. Have you ever had any employee bring
6    to your attention personally that the flow of credit
7    bureau disputes is so high that there is more help
8    needed to deal with those disputes?
9    A    I'm not aware of any problem at all.
10   Q    All right. No employee in your company has
11   ever complained that the work flow as far as credit
12   bureau disputes is concerned is too much?
13   A    No.
14   Q    That they don't have enough time to deal with
15   those disputes?
16   A    No.
17   Q    That they're not sufficiently trained to deal
18   with those type of investigations?
19   A    Not to my knowledge.
20   Q    No problem at all?
21   A    Not to my knowledge.
22   Q    Nobody's brought the -- a problem to the
23   company's attention. Correct?
24   A    Nothing's come to me.
25   Q    And nothing has come to your attention

Page 118

1    personally?
2    A    No.
3    Q    That's your testimony?
4    A    No.
5    Q    Okay. In the last three years, let's say,
6    have there been more than two people at your company who
7    would have any degree of responsibility for
8    investigating credit bureau disputes?
9    A    Possibly three, but never more than that.
10   Q    Okay. How long has Tina Votava been with
11   your company?
12   A    Approximately one year.
13   Q    Do you know what she did before then?
14   A    I can recall who they were 'cause I checked
15   references out, but I don't remember all the details,
16   no.
17   Q    And do you know whether she had any training
18   in conducting credit bureau investigations?
19   A    She had no background in credit at all.
20   Q    And any background in conducting
21   investigations for any other type of matter other than
22   credit disputes?
23   A    No.
24   Q    And how about Tina Eddy did she have any back
25   ground --

Page 119

1    A    Dawn Eddy.
2    Q    I apologize. Dawn Eddy. Did she have any
3    background in investigations of any sort including
4    credit investigations?
5    A    Not that I'm aware of.
6    Q    Okay. In those circumstances where your
7    company decides on a credit bureau dispute to delete an
8    account, sir, you told me there was some circumstances
9    where the company says we've got to delete this account.
10   Correct?
11   A    Yes.
12   Q    So let's say that that's either the situation
13   where it's clear that, you know, the consumer's dispute
14   is legitimate and the consumer doesn't owe money or the
15   situation where it's too close of a call and your
16   company gives the benefit to the consumer. Let's talk
17   about that situation. Okay?
18       When the account is deleted by ACCB at one of
19   the national bureaus, does it delete it at all three of
20   the bureaus at the same time?
21   A    Each month updated filings are reported to
22   any and all three credit bureaus.
23   Q    My question is when your company makes a
24   decision after an investigation to delete an account,
25   does it delete it with one bureau or does it delete it

Page 120

1    with all three bureaus?
2    A    All three bureaus.
3    Q    Is it supposed to delete an account with all
4    three bureaus at the same time?
5    A    It's our intent, yes.
6    Q    Is it the practice and the policy of your
7    company that if it's to be deleted with one bureau, it
8    should be deleted with all three?
9    A    Once the work card is updated, whatever that
10   discipline is, that's how it's reported.
11   Q    Would you agree with me, sir, that if it's
12   deleted with one bureau, it should be deleted with all
13   three?
14   A    Certainly.
15   Q    And that is what the practice is supposed to
16   be at your company?
17   A    Yes.
18   Q    There is no reason to delete it with one
19   bureau and leave it on the other two. Correct?
20   A    Certainly not.
21   Q    Okay.
22       MR. CRUZ: Two minutes.
23   BY MR. SOUMILAS:
24   Q    Does your company have a website?
25   A    Yes.

30  (Pages 117 to 120)

Case 2:09-cv-00646-TJS Document 45-9 Filed 12/18/09 Page 7 of 22

Dixon-Rollins v. Experian Information Solutions, et al.                    TOM DREHER, 10/1/09

Page 129

1    A    I don't know the time of how long that's
2    kept. I only can tell you that I know it's not
3    something that stays in any record on the system for a
4    very long period of time. They're supposed to transfer
5    the information on to the work card.
6    Q    Do you know, sir, how long it stays on what
7    you call the Outlook system or the Outlook package?
8    A    No, I don't.
9    Q    Does it stay there at least a day?
10   A    I'm not sure.
11   Q    How do we know what an investigator like Tina
12   did if she doesn't keep any records of what she did?
13   A    It's on the work card.
14   Q    All right. Are you saying that everything
15   that an investigator would have done in a credit bureau
16   dispute is supposed to be marked on a work card?
17   A    Supposed to be, yes.
18   Q    So even if we assume that there was a
19   separate record in Outlook that had the names of
20   somebody she called or some notes that she took,
21   whatever that she did, that data is supposed to be
22   entered and put into the work card. Correct?
23   A    Yes, in a perfect world everything is
24   transferred on to the work card and that's it.
25   Q    According to the policies and practices of

Page 130

1    your company whatever is done in connection with an
2    investigation into a credit bureau dispute is supposed
3    to be memorialized on the work card?
4    A    Yes.
5    Q    And the work card data would not get deleted
6    or disappear. Correct?
7    A    Yeah, I'm guessing our records are probably
8    right now in the ten plus years.
9    Q    Right. When we saw a work card for the
10   disputed account that Mrs. Dixon-Rollins was disputing
11   that is the work card that has all the information for
12   that account. Correct?
13   A    Yes.
14   Q    There wouldn't have been a summary of what
15   was done during an investigation that was purged a day
16   or a month after it was entered into the work card?
17   A    If a client sent a document by e-mail or fax,
18   it would then be scanned, it would be part of the file
19   on the work card file system.
20   Q    Okay. Is there any reason to think that
21   whatever it is that Tina or whatever other person was
22   handling credit bureau investigations during that period
23   of time would not be memorialized and put down in the
24   work card system?
25   A    Procedure is to document it on to the work

Page 131

1    card.
2    Q    Okay. Now, if you're saying Tina could have
3    used Outlook or some other communications, but you don't
4    know of any record retention policy for those notes that
5    would have been taken in connection with an
6    investigation. Correct?
7    A    That's correct.
8    Q    You don't know that the notes don't still
9    exist today? You just don't know what the record
10   retention policy is?
11   A    I don't know, but I know it's short. I just
12   have not recalled what it is anymore.
13   Q    Okay. So you do know it's short?
14   A    Very short.
15   Q    Oh, very short. Okay. Do you know why it's
16   very short, why aren't those records kept?
17   A    I don't have a good answer. Because I'm not
18   sure it's important to retain that. It's something you
19   do and then you automatically scan the document to prove
20   it and/or you make the note in the credit bureau file --
21   I mean, the work card, the conclusion, that's it.
22   Q    So if everything is supposed to be in the
23   work card alrEddy, there wouldn't be anything missing?
24   A    There should not be, no.
25   Q    All right. Now, we had also before the break

Page 132

1    mentioned your company's website. I would like to show
2    you a few pages from that website that we'll mark
3    as Dreher -- Dreher -- let the court reporter please
4    mark it Dreher 5.
5    (Thereupon Exhibit 5 was marked.)
6    BY MR. SOUMILAS:
7    Q    And those -- what I put in front of you as
8    Dreher 5, sir, is only five pages of a printout. It's
9    not -- I'm not representing that it's your entire
10   website. Do you recognize these five pages as your
11   company's website?
12   A    Yes, it does appear that way, yes.
13   Q    Would you agree with me that the first page
14   of Dreher 5 is your homepage. So when somebody finds
15   the company, that's what the screen looks like at the
16   beginning?
17   A    Yes.
18   Q    And like most websites, you could click on
19   different links and see different pages. Correct?
20   A    Yes.
21   Q    Have you ever seen that right on the first
22   page of your website it says that the -- that the
23   company has been in business for 45 years?
24   A    Established in 1955, yes.
25   Q    The company was established in 1955, you

33 (Pages 129 to 132)

Dixon-Rollins v. Experian Information Solutions, et al.                    TOM DREHER, 10/1/09



Page 141

1    report to Chancellor about the status of its account.
2        A    Unless I researched it, I do not have an
3    answer. I do not know.
4        Q    Okay. Do you have any knowledge that
5    Chancellor Properties was calling up or writing to ACCB
6    every month inquiring about the status of the
7    Dixon-Rollins account?
8        A    I would have no way of knowing.
9        Q    Is there any evidence that Chancellor
10   Properties was knocking on the door saying where is our
11   money for this Dixon-Rollins account, would you give us
12   an update?
13       MR. PERR:  You mean other than the evidence
14   that's alrEddy in the record?
15       MR. SOUMILAS:  No.  No.  There is no evidence
16   in the record that they ever asked where is our
17   money.
18   BY MR. SOUMILAS:
19       Q    Is there any evidence that Chancellor
20   Properties inquired and said are we ever going to get
21   paid on this account, give us a status update?
22       A    I'm not aware of anything.
23       Q    Okay. Let's go to the final page of Dreher 5
24   which is a part of your website that has a sales
25   presentation preserving your reputation and a third

Page 142

1    section called high standards. You see that?
2        A    Yes.
3        Q    All right. And I'll read you the first
4    sentence for the record of high standards. It says at
5    ACCB we always work in complete compliance with all
6    state and federal laws including the Fair Debt
7    Collection Practices Act and the Fair Credit Reporting
8    Act. You see that?
9        A    Yes.
10       Q    All right. Has any court ever made a ruling
11   that said that ACCB always works in complete compliance
12   with all state and federal laws including the Fair Debt
13   Collection Practices Act and Fair Credit Reporting Act?
14       MR. PERR:  Object to the form of the
15   question.
16       THE WITNESS:  I have no idea what you're
17   asking.
18   BY MR. SOUMILAS:
19       Q    Do you base this statement that you are
20   always working in complete compliance based on some
21   ruling that you received from a court in this country
22   that says ACCB you're in complete compliance always?
23       A    No.
24       Q    Okay. Now, did you ever receive an opinion
25   from an administrative agency of the government such as

Page 143

1    the Federal Trade Commission that you are always in
2    complete compliance with state and federal laws
3    including the FDCPA and FCRA?
4        A    No.
5        Q    Did you ever receive an opinion from an
6    attorney or a law firm saying that you are always in
7    complete compliance with laws including the FCRA and
8    FDCPA?
9        A    No.
10       Q    Okay. You told me that in the cases where
11   you were sued under the FCRA and FDCPA you are not aware
12   that your company ever won any of those cases. Correct?
13       A    No, no cases went to judgment ever.
14       Q    Okay. Your company settled all the cases?
15       A    I classify as -- as nuisance lawsuits that
16   are generating a thousand, $2,000.
17       Q    Okay. So you classified the lawsuits as a
18   nuisance to your company?
19       A    Yes.
20       Q    Not legitimate?
21       A    That's correct, yes.
22       Q    But you did not get any ruling from any court
23   in any of those cases that you are in -- always in
24   complete compliance with the federal and state laws
25   including the FCRA and FDCPA. Correct?

Page 144

1        A    Certainly not.
2        Q    That is your company's own judgment that it
3    is always in complete compliance. Correct?
4        A    Yes.
5        Q    Okay. You told me you looked at all of the
6    documents yesterday that your company has with respect
7    to the disputed debt for Mrs. Carmon Dixon-Rollins.
8    Correct?
9        A    I certainly tried to go through all of it,
10   yes.
11       Q    And would you, after having reviewed what you
12   reviewed, also say that your company was always in
13   complete compliance with state and federal laws
14   including the Fair Debt Collection Practices Act and
15   Fair Credit Reporting Act when it comes to
16   Mrs. Dixon-Rollins?
17       A    I'm not aware of any violation.
18       Q    Okay. Why don't we go through your file.
19   Let's begin within Dreher 2, sir, which is the document
20   we called the work card. And I believe it begins at the
21   numbers that are labeled ACCB 1. Correct?
22       A    Yes.
23       Q    You told me that's all part of the work card?
24       A    Yes.
25       Q    Do you know how much money your company ACCB

36 (Pages 141 to 144)

Dixon-Rollins v. Experian Information Solutions, et al.                    TOM DREHER, 10/1/09

## Page 145

1  was trying to obtain -- to collect on this debt from
2  Mrs. Dixon-Rollins?
3       A    690.
4       Q    And what was that for?
5       A    It would appear to be one month's rent.
6       Q    What month?
7       A    Which month?
8       Q    Yes.
9       A    This would have been the last month that was
10 owing. It was my understanding she was evicted.
11      Q    Okay. Which month did she not pay rent?
12      A    I can't tell you for sure. But I'd say it
13 was based upon the end of the lease which is July 31,
14 '05. No, I guess, they -- evidently they didn't charge
15 her for subsequent months after she was evicted in
16 the -- 2004.
17      Q    All right. Would you look at the part of the
18 work card that begins at ACCB 1, please, sir. That's
19 the collections checklist. It appears to reference this
20 rental property, Awbury Park Apartments, unit A16.
21 Correct?
22      A    Yes.
23      Q    You see the lease expiration date they have
24 it as July 31st, 2004?
25      A    Right.

## Page 146

1       Q    And there's a move out date of June 30th,
2  2004?
3       A    Yes, uh-huh.
4       Q    Okay. Is it your understanding that the
5  balance owed of $690 is for that last month?
6       A    Based upon this form, yes.
7       Q    Okay. Based on -- the reason why your
8  company tried to collect 690 bucks -- $690. Excuse me.
9  Is it because you understand that she did not make a
10 payment after she was evicted for the last month of the
11 lease expiring on July 31, 2004?
12      A    Well, we are missing an itemized statement
13 that brings this from beginning to end on the payments
14 she made, so I can't assume anything, but...
15      Q    I'm not asking you to assume. I'm asking you
16 why your company was trying to collect $690. For what?
17 You told me she missed a months payment, so if that's
18 the case I want to know which month.
19      A    My answer stands. It's the last month based
20 upon what the terms say here on exhibit 0002.
21      Q    Okay. So the last month your understanding
22 would be July 2004, sir?
23      A    Right.
24      Q    Was there a lease that she had for 2004?
25      A    She may not have a lease each year. It may

## Page 147

1  be a continuation.
2       Q    I'm just asking did she have a lease or was
3  she month to month?
4       A    I'm looking to see if there is an attachment
5  for a lease.
6       Q    Okay.
7       A    There may be one. I saw something here
8  that -- there's the application. Well, there's no
9  attachment showing that there were new leases signed
10 each year. This was a continuation of her first lease
11 taking place back in 2002.
12      Q    Do you know whether it was a continuation
13 from year to year or from month to month or whether --
14      A    I assume it's year to year. But I'll be very
15 honest with you, I can't read this.
16      Q    So you don't know?
17      A    I'd have to be able to sit down and be a
18 larger print so I could read it.
19      Q    You would agree with me that the lease that
20 we have at ACCB 4 is a lease from 2002?
21      A    As far as -- the only document we have is a
22 lease took out in 2002, yes.
23      Q    All right. That's not a lease for any
24 apartment in 2004. Correct?
25      A    As I say, I can not read everything here to

## Page 148

1  know exactly what it's saying, but more times not it's a
2  continuation from year to year.
3       Q    Do you see any continuation from year to
4  year?
5       A    2002 and we're in 2004, so she evidently
6  stayed another year at least.
7       Q    I think she did.
8       A    Two years.
9       Q    I'm just wondering whether there's a lease.
10 You have 2004 -- I mean, I'm sorry, a 2002 lease. If
11 you look at ACCB 5. It's a move in date of July 15,
12 2002 and an ending date of July 31, 2003. You see that.
13 Correct?
14      A    I don't have an answer.
15      Q    Okay. If you look at ACCB 5 do you see that,
16 sir, that's a lease that terminates on July 31, 2003 on
17 the right-hand side about midway down on the page it
18 says ending date of lease. Would you like me to point
19 it out to you?
20      A    I see it.
21      Q    Okay. And you see that the rent is $610.
22 Right?
23      A    I don't have all the documents, obviously,
24 here.
25      Q    Well, that's why we spent a good part of the

37  (Pages 145 to 148)

Case 2:09-cv-00646-TJS   Document 45-9   Filed 12/18/09   Page 10 of 22

Dixon-Rollins v. Experian Information Solutions, et al.                          TOM DREHER, 10/1/09

Page 149

1    beginning of this deposition to find out what documents
2    your company have -- had. Did your company --
3        A    I'm not saying that I have it. I'm not sure
4    we got it from our client.
5        Q    Oh, all right. Well, that's what I'm trying
6    to figure out. As far as your work card is concerned
7    you didn't have any document that showed that this lady
8    owed any money in 2004?
9        A    Certainly in that the client has given me a
10   statement of security deposit that illustrates they owe
11   690 in unpaid rent --
12       Q    Okay. What does --
13       A    On 0002.
14       Q    That's not what it says, sir. That says $690
15   in liquidated damages. You see that?
16       A    Yeah.
17       Q    Okay. That doesn't say unpaid rent, you
18   agree with me? No? Where does it say anything about
19   rent?
20       A    It does not.
21       Q    Okay. Now, where does the 690 figure come
22   from?
23       A    Under 0001 the collection check list shows
24   690.
25       Q    That says that's the balance owing. That

Page 150

1    doesn't say that that's the rent. You would agree with
2    me? The only rent that I see on any lease documents
3    that you have here at ACCB 4 and 5 is a $610 per month
4    monthly rent. Do you see any other monthly rent?
5        A    As I state 0001 shows 690 that's directly
6    from the client. That's what the debtor/consumer owes.
7    The statement of security deposit, 0002, again,
8    liquidated damages was a very common terminology used
9    for left over rent.
10       Q    Okay. That very same document you're looking
11   at has a monthly charge of rent of 675 further up. Do
12   you see that?
13       A    Yes.
14       Q    Okay. Where does the 675 monthly figure come
15   from? Other than the fact that it's on this piece of
16   paper that Chancellor gave you. Is there a lease or is
17   there some continuation to a lease or any other document
18   that shows any monthly rent of 675?
19       A    Other than what my client has here that's all
20   I know.
21       Q    All right. Your company is collecting 690.
22   Your understanding that 690 is the rent for July 2004
23   after she is legally evicted and leaves?
24       A    I don't have the answer. I don't know.
25       Q    Okay. Do you know what specifically your

Page 151

1    company is collecting when they're trying to collect
2    $690 from Mrs. Dixon-Rollins?
3        A    These two documents I just quoted.
4        Q    Okay. You know that Chancellor Properties
5    sends you something that has a balance owed 690.
6    Correct?
7        A    Yes, I'm saying two forms say it's 690, yes.
8        Q    Okay. So that is what you are trying to
9    collect because that's what Chancellor Property says 690
10   is owed. Correct?
11       A    Yes.
12       Q    You do not know nor do you have any documents
13   here in this file as to what that 690 actually
14   represents? You don't know that it's rent, you don't
15   know what it is?
16       A    That's correct.
17       Q    And you don't know that it's owed other than
18   the fact that Chancellor Property says that it's owed?
19       A    I believe it's owing.
20       Q    You believe it -- that the 690 was owing?
21       A    Yes.
22       Q    Okay. But you don't have any documents as
23   far as what Chancellor Properties gave you that shows
24   why specifically $690 would have been owing?
25       A    I don't have full documentation, yes.

Page 152

1        Q    All right. So your company just assumed that
2    $690 would have been owing?
3        A    Yes.
4        Q    And did your company assume that $690 would
5    have been owing in 2005?
6        A    The debt is 2004. I'm sorry. What's 2005?
7        Q    Is your company's assumption that that same
8    debt of $690 would also have been owing in 2005?
9        A    Yes.
10       Q    And also would have been owing in 2006?
11       A    Yes.
12       Q    And also would have been owing in 2007?
13       A    Yes.
14       Q    And also would have been owing in 2008?
15       A    Yes.
16       Q    And also would have been owing in 2009?
17       A    Yes.
18       Q    Okay. Now, let's look at the part of the
19   work card which is your company's input of activity in
20   pursuit of this debt. Would you agree with that?
21       A    Yes.
22       Q    All right. Let's start at the beginning
23   October 4, 2004, what's going on there?
24       A    It's just simply saying that was a set-up
25   date on a -- on a new account. They call it a new

38  (Pages 149 to 152)

—

Dixon-Rollins v. Experian Information Solutions, et al.                    TOM DREHER, 10/1/09

---

## Page 169

1  Q   It might be the case that it's the first time
2  you know anything. But is that what the entry means?
3  That this is a debtor who has some real estate and a
4  current auto loan and, therefore, might have some money
5  to be able to pay this $690 debt?
6  A   I can not be sure how to interpret his notes.
7  Q   Okay.
8  A   But that's what I would assume I said.
9  Q   Okay. So you're not sure. Are you -- could
10 you tell me continuing to look at these notes in early
11 2005 when the first time is that, according to ACCB's
12 notes, ACCB actually learns something about Carmon
13 Dixon-Rollins and this account?
14     MR. PERR: I'm just going to object to the
15 form of the question.
16     THE WITNESS: Yeah, learns what?
17     MR. PERR: Learns what?
18     MR. SOUMILAS: I don't know. The way you put
19 it is you don't know anything.
20 BY MR. SOUMILAS:
21 Q   Why don't we just move to the entry that is
22 February 28th, 2005 at the very bottom of Bates 7. Do
23 you see that?
24 A   Yes.
25 Q   Okay. That's a telephone call?

## Page 170

1  A   Yes.
2  Q   All right. Does it continue on the top of
3  the next page?
4  A   Yes.
5  Q   Okay. Is the debt collector speaking with
6  somebody named Maurice?
7  A   Yes.
8  Q   Do you know who Maurice is?
9  A   At this time, no. But I know at this time
10 that this was her spouse, I believe, or soon to be a
11 spouse.
12 Q   Okay. Is the entry here from February 28th,
13 2005 the first time that your company ACCB gets some
14 message from Maurice that at least he thinks this matter
15 was resolved in court?
16 A   Yes.
17 Q   All right. Would you agree with me then at
18 least, according to this, to these records, the work
19 card, ACCB now has some reason to think that somebody is
20 disputing this collection account because they think it
21 was resolved in court?
22 A   The next entry talks in terms of giving him a
23 SODA and that is an itemized statement.
24 Q   Right. But I'm not to the next entry yet.
25 I'm just asking whether the --

## Page 171

1  A   I only can assume that I'm talking about. I
2  don't know. It looks as if he agreed to accept some
3  kind of document showing the balance owing.
4  Q   What is a SODA?
5  A   That is a terminology that's -- there's a
6  half a dozen different ones. All about the same thing.
7  They're pretty much an itemized statement.
8  Q   Okay. Let's see if I understand this. It
9  says MSD will CB for fax of SODA and will fax DSP LTR.
10 Do you see that?
11 A   Yes.
12 Q   What does that mean in plain English?
13 A   That's referring to sending him an itemized
14 statement.
15 Q   Okay. Tell me each one what it means. What
16 does M stand for?
17 A   Okay. Are you at 3:43? Where are you
18 quoting from?
19     MR. PERR: (Indicating).
20     THE WITNESS: Oh, you're still back -- you're
21 back up there again. Okay. I went to the next
22 line.
23 He is saying he thought this was resolved in
24 court. Maurice -- M is Maurice -- said will call
25 back for fax number so we can send a SODA or an

## Page 172

1  itemized statement to him.
2  BY MR. SOUMILAS:
3  Q   And then it continues M will fax what?
4  A   That statement. That SODA. That they're
5  all --
6  Q   DSP LTR doesn't mean dispute letter?
7  A   Yes, he's saying at the very last words, will
8  fax dispute letter, yes.
9  Q   Okay. Given this entry on February 28th,
10 2005 would you say that this is the first time,
11 according to the work card, that your company knows that
12 there is some dispute about this account and that at
13 least Maurice thought it was resolved in court?
14 A   Maurice has no responsibility. We don't know
15 who he even is. It's not even stated that he's a
16 spouse.
17 Q   Okay. But your company called Maurice. He
18 didn't call them. Right?
19 A   No, it appears that we called the residency
20 and he answered phone.
21 Q   All right. You called the residence of the
22 debtor?
23 A   Carmon Dixon-Rollins.
24 Q   Okay. You don't know whether Maurice is the
25 spouse or not?

43 (Pages 169 to 172)

Case 2:09-cv-00646-TJS   Document 45-9   Filed 12/18/09   Page 12 of 22

Dixon-Rollins v. Experian Information Solutions, et al.                                    TOM DREHER, 10/1/09

Page 173

1    A   I believe I – at the end looking at the
2   documentation, she married the man, I don't know when
3   that happened.
4    Q   Okay. According to your notes, do your
5   collectors know whether Maurice is a spouse to Carmon at
6   this time or he's not?
7    A   It's not clarified or documented on the -- on
8   the work card.
9    Q   If he's not a spouse, should they -- your
10  collectors be talking to Maurice about Carmon's debt?
11   A   No, it probably should not.
12   Q   All right. So that would not be in
13  compliance with the Fair Debt Collection Practices Act.
14  Correct?
15   A   Yes.
16   Q   If they are speaking with Maurice and they
17  don't know Maurice to be the spouse, then they are not
18  always in compliance with the Fair Debt Collection
19  Practices Act. Would you agree with that statement?
20   A   Well, on 3/31 it does show spouse Maurice on
21  the entry. So he's not consistent in his notes. I'm
22  sorry. He did, too. He did -- he did show the carry
23  over of February 28th and it does say before his name
24  SPS Maurice.
25   Q   This is on February 28th --

Page 174

1    A   Yes.
2    Q   -- 2005, sir?
3    A   Yes.
4    Q   Where does it say SPS Maurice?
5    A   Third -- second line. The very end. Talked
6   to, TT, talked to spouse Maurice said...
7    Q   All right. So you know that he's the spouse
8   at this point?
9    A   He's stating that, yes.
10   Q   All right. And he, the spouse, then seems to
11  think, 'cause you're the one who told me we don't know
12  who Maurice is, so we do know who Maurice is, he's the
13  spouse? Your people --
14   A   By the notation, yes.
15   Q   Yeah. Your people are calling the residence
16  of Carmon and they're speaking to her spouse?
17   A   Yes.
18   Q   Okay. So we know as of February 28th, 2005
19  that at least her spouse is saying that this matter was
20  resolved in court and it is in dispute?
21   A   Yes, Maurice is stating this was resolved in
22  court, yes.
23   Q   This is the first time, according to these
24  notes, that your company is alerted of any problem or
25  any dispute about this account. Correct?

Page 175

1    A   Yes. Yes.
2    Q   All right. Then we see an entry on the next
3   month March 31, 2005 where the entry is at 8:38 a.m. and
4   there's another call to the residence and they're
5   speaking with Maurice again. Correct?
6    A   Yes.
7    Q   And Maurice says that they thought that
8   attorney Matthew Litman (sic) was working on this. Do
9   you see that?
10   A   Yes.
11   Q   Now, when your collectors learn that there's
12  an attorney who is working on a disputed collection
13  account with a consumer is it the practice at your firm
14  to continue dealing with that consumer directly or
15  should they only deal with the attorney who is working
16  on the disputed collection account?
17   A   Wait 14 days before you make any contact and
18  instruct the parties to call us directly, the attorney.
19   Q   If your firm is satisfied that there is an
20  attorney involved on behalf of a consumer, is it your
21  firm's practice to stop calling the consumer?
22   A   They should stop, yes.
23   Q   You would agree with me that it's a violation
24  of the Fair Debt Collection Practices Act to continue
25  communicating with a consumer who is represented by an

Page 176

1   attorney in connection with a collection matter?
2    A   Yes.
3    Q   Okay. So anyways would you agree with me
4   that as of March 31st, 2005 your firm has some
5   understanding that there -- there is a dispute that an
6   attorney Matthew Lietman is working on?
7        MR. PERR: I'm going to object. You're –
8   BY MR. SOUMILAS:
9    Q   Would you agree with that? That this Matthew
10  Lietman is working at least with Maurice in trying to
11  deal with this account?
12   A   Maurice is not a responsible party on this
13  debt.
14   Q   I hear you. But he's saying there's an
15  attorney that's working on this. That's what the entry
16  says here. Right? I presume this means the debt. Do
17  you think it means something else?
18   A   I agree that's what was said.
19   Q   Okay. So if an attorney is working on this
20  debt, your company knows that as of March 31st, 2005 and
21  the attorney's name is Matthew Lietman, according to the
22  notes. Correct?
23   A   Yes.
24   Q   All right. What does the April 4 -- I'm
25  sorry. April 12th, 2005 entry mean when it says EAM

44 (Pages 173 to 176)

Dixon-Rollins v. Experian Information Solutions, et al.                    TOM DREHER, 10/1/09

Page 177

1    general follow-up good info?
2        A    I'm unsure.
3        Q    Okay.  There's another entry on April 12,
4    2005 about a letter to 01 proper conclusion.  You see
5    that?
6        A    What date, please?
7        Q    April 12, 2005 12:03.  Is your company
8    sending a letter?
9        A    I'm not sure.
10       Q    Okay.  Let's go to April 18, 2005.  Is that a
11   telephone call with Carmon, one of your collectors and
12   Carmon?
13       A    This is Carmon calling our office.
14       Q    Okay.  And is Carmon saying that she thought
15   that this was paid through the court?
16       A    Yes.
17       Q    All right.  So that's April 18, 2005 where
18   the debtor herself is saying I think this thing is paid
19   through a court.  Correct?
20       A    Yes.
21       Q    All right.  So at this point April, 2005 your
22   company knows that Carmon's husband Maurice is disputing
23   this and he thought it was resolved in court.  They know
24   that there was an attorney Matthew Lietman, supposedly,
25   involved in the case and that Carmon herself thought

Page 178

1    that this was paid through a court.  Correct?
2        A    Yes.
3        Q    All right.  This is according to your own
4    work card so far.  Okay?
5        A    Yeah.
6        Q    Let's -- is that correct, sir?
7        A    Yes.
8        MR. SOUMILAS:  Okay.  Let's go off the record
9    for a moment to replace the tape.
10       MR. CRUZ:  We're off the video record.
11   (Thereupon a recess was taken after which the deposition
12   continued as follows:)
13       MR. CRUZ:  We're on the video record.
14   BY MR. SOUMILAS:
15       Q    All right.  So let's continue with this
16   chronology, sir.  If we look down to about May 16th,
17   2005 an entry at 14:23 military time, you agree with me
18   that this is another telephone call by your collection
19   people to the residence of Ms. Carmon Dixon-Rollins?
20       A    Yes.
21       Q    Okay.  So they're calling her directly.
22   Correct?
23       A    Yes.
24       Q    All right.  And see -- she says she will fax
25   a letter from her attorney.  You see that?

Page 179

1        A    Yes.
2        Q    All right.  So at this point she is saying
3    she's going to fax a letter.
4        A    Yes.
5        Q    Does she, in fact, fax that letter?
6        A    Yes.
7        Q    And you've alrEddy identified that on that
8    exact same date if you look at ACCB Bates 19.
9        A    Yes.
10       Q    You told me that this was a fax that came
11   from Dix -- Carmon Dixon to Eric Allan of your firm and
12   it included the April 6, 2005 letter from attorney
13   Matthew Lipman.  Correct?
14       A    Yes.
15       Q    And you told me at least around this time May
16   16th, 2005 or so your company would have also received a
17   letter otherwise it wouldn't be in the work card?
18       A    Yes.
19       Q    All right.  So now you know that there's an
20   attorney who is working on this file and you know that
21   it's disputed and at least according to the attorney's
22   letter it says that it was paid.  Correct?
23       A    I -- I'd have to go back and find the
24   document.
25       Q    Would you take a look at Bates ACCB 14 which

Page 180

1    is a letter from the attorney that she faxes in that day
2    May 16th, 2005.
3        A    Yes.  I got it.
4        Q    Okay.  He says our client agreed to settle
5    this matter and I forwarded a letter dated October 18,
6    2004 confirming same.  You see that?
7        A    Yes.
8        Q    All right.  And then he further says in that
9    paragraph a review of the docket confirms that this
10   matter was withdrawn on November 22, 2004.  Correct?
11       A    Yes.
12       Q    All right.  Up to this point has your company
13   done any type of an investigation to determine whether
14   this is a debt that has been paid through a court
15   process like Carmon and her husband and her attorney
16   say?
17       A    I think at this point here there's not been
18   an investigation yet, no.
19       Q    Okay.  Now, if you look a few entries further
20   down May 24, 2005, according to your records, the
21   company received a fax directly from attorney Matthew
22   Lipman who said do not call anymore or there will be a
23   lawsuit.  Do you see that?
24       A    Yes.
25       Q    All right.  So now this is a second letter

45 (Pages 177 to 180)

Dixon-Rollins v. Experian Information Solutions, et al.

TOM DREHER, 10/1/09

## Page 181

1 from an attorney that your company has a copy of
2 disputing this debt. Correct?
3    A  Yes.
4    Q  All right. And let's take a look at that
5 letter. I think you've alrEddy identified it
6 previously. It was at ACCB Bates 17 and 18, sir.
7    A  Yes.
8    Q  All right. And you would agree with me that
9 this letter from attorney Lipman doesn't simply say stop
10 calling or else there will be a suit. It says other
11 things as well that are not part of the work card.
12 Correct?
13    A  Yes.
14    Q  He says that he is enclosing a copy of the
15 municipal court docket that shows that the matter was
16 withdrawn with prejudice on November 22, 2004 at two
17 four -- excuse me, 2004, after Ms. Dixon made full and
18 final payment to Awbury Park. You see that? That's
19 what the letter says?
20    A  Yes, that's what the letter says, yes.
21      MR. PERR: Without prejudice. You misread
22 that.
23      THE WITNESS: Yeah, it's without prejudice.
24 It's not prejudice.
25 BY MR. SOUMILAS:

## Page 182

1    Q  Okay. If I misread it, I apologize. I'll
2 read it again so that the letter is clear. He's saying
3 he's enclosing a copy of the municipal court docket
4 which shows that this matter was withdrawn without
5 prejudice on November 22, 2004 after Ms. Dixon made full
6 and final payment to Awbury Park. He says that he's
7 enclosing that correct?
8    A  Yes.
9    Q  Okay. The fax that your copy -- your company
10 has a copy of here shows a four-page fax going to your
11 company. Correct? The cover page is ACCB 16 and then
12 there is two more pages of Mr. Lipman's letter at ACCB
13 17 and 18. Do you see that?
14    A  Yes.
15    Q  Where is the fourth page of the fax?
16    A  I'm sorry. It's not here.
17    Q  Okay. At least according to the fax line it
18 looks like there were four pages. Correct?
19    A  I think they had two separate -- these were
20 two separate -- let's see --
21    Q  Well, let me try it another way. Do you have
22 any reason to believe that this attorney Lipman did not
23 send in the municipal docket with his fax like he said
24 he did?
25    A  We have a letter from him. I don't know

## Page 183

1 where it came from. But it shows the eviction and shows
2 the hearing date and the reschedule date. I don't know
3 if it's here or not, but I know I saw it.
4    Q  All right. Let -- let's just focus on this
5 May 23rd, 2005 fax. The fax cover form at Bates ACCB 16
6 says it's page 1 of 4. Do you see that at the top?
7    A  Yes.
8    Q  And then there's page 2 of 4 and 3 of 4 are
9 Mr. Lipman's letter?
10    A  Yes.
11    Q  Do you have any reason to believe that
12 Mr. Lipman did not, in fact, include the municipal court
13 docket on the fourth page even though he says in his
14 cover letter that he sent it to you?
15    A  I saw a form. I don't know if this was an
16 attachment to this or not.
17    Q  Okay. You would agree with me at least that
18 ACCB 17 Mr. Lipman's letter says Ms. Dixon owes no money
19 to Awbury Park. That's very clear in the letter?
20    A  Yes.
21    Q  Okay. And he clearly says my client has
22 advised you continuously that the debt has been paid and
23 that no further funds are due. That's pretty clear.
24 Correct?
25    A  Yes.

## Page 184

1    Q  Now, we're up to May 24th. I'm sorry. May
2 23rd, 2005. Does your company conduct an investigation
3 at this point to find out whether the funds are really
4 due?
5    A  It doesn't appear as if we had any additional
6 contact after that until we sent a fax to our client
7 with a copy of the letter from the attorney on June 7th,
8 '05.
9    Q  All right. Focusing on my question, sir,
10 does it appear from your own records and the work card
11 that there's any investigation into this dispute that
12 ACCB conducts in the late May 2005 time frame?
13      MR. PERR: He just asked and answered.
14      THE WITNESS: No, the answer is June 7th.
15 BY MR. SOUMILAS:
16    Q  Your answer is that on June 7th the company
17 conducts an investigation?
18    A  We start the investigation, yes.
19    Q  Okay.
20    A  We sent information to our client and
21 attached the attorney letter.
22    Q  Well, let's not get quite to June 7th just
23 yet. Why don't you look at May 31, 2005 at 8:06 there's
24 an entry from EAM, it says received dispute letter. Is
25 that what it says?

**SUMMIT COURT REPORTING, INC.**
**215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com**

Dixon-Rollins v. Experian Information Solutions, et al.                    TOM DREHER, 10/1/09

## Page 189

1  It just sits there in limbo.
2     Q    Would you agree with me that at least
3  according to documents that you have here in your work
4  card you can't tell what the results of the June 7, 2005
5  investigation were?
6     A    I'm -- I'm -- I'm unable to see that, no.
7     Q    Could you tell what was done as part of the
8  investigation other than faxing to Chancellor Properties
9  the consumer's dispute letter as well as the letter of
10 the consumer's attorney?
11    A    I'm unable to tell you anything because the
12 notes are not there.
13    Q    Did -- do you know whether Chancellor
14 Properties ever received that fax?
15    A    I have nothing showing here that they did
16 anything or responded to us or anything.
17    Q    Do you know whether they ever -- well, I
18 think your report --
19    A    Well, they did way, way later but...
20    Q    Well, in connection with that June 7, 2005
21 fax that started the investigation do you know whether
22 Chancellor responded to your company ACCB with anything?
23    A    I have no notations, period.
24    Q    Okay. Let's focus for a moment on August 22,
25 2006. And there's an entry from HMH. It says Experian

## Page 190

1  DSP. I guess it's dispute.
2     A    Yes.
3     Q    All right. Is that the first credit bureau
4  dispute that your company has received concerning this
5  account for Mrs. Dixon-Rollins?
6     A    It appears as if it's coming from Experian
7  and they're saying that account paid and settled prior
8  to being reported to the credit bureau.
9     Q    All right. Would you please take a look back
10 at Dreher 4 which is that group of ACDV documents. Now
11 I said -- I know you said you're not familiar with this
12 form, sir, but if you look at the top right-hand side
13 there's a response date of August 22, 2006. Do you see
14 that? A sent --
15    MR. PERR:  (Indicating.)
16    THE WITNESS:  Yes, I see it, yes.
17 BY MR. SOUMILAS:
18    Q    Yeah. And there's a description of the
19 dispute that says account paid and settled prior to
20 being sent to the credit bureau. Attorney notified
21 Matthew Lietman it says here. See that under the part
22 of the dispute reason?
23    MR. PERR:  (Indicating).
24    THE WITNESS:  Yeah, I see it.
25 BY MR. SOUMILAS:

## Page 191

1     Q    All right. Is -- is -- do you know whether
2  your company's subscriber code for Experian is what's
3  listed as the account number right above that dispute?
4     A    The only thing I can recognize is the first
5  initials and numbers, no.
6     Q    All right. At any rate you know that
7  Experian is communicating with you with a credit bureau
8  dispute here on -- in August 2006 and the problem is
9  according to Experian this was something that was paid
10 and settled prior to being reported to the credit
11 bureaus and attorney's notified and there's an
12 attorney's name there. Correct?
13    A    Yes.
14    Q    All right. You told me that your company
15 would investigate these credit bureau disputes as well.
16 Correct?
17    A    Yes.
18    Q    Who would have been doing the investigation
19 in the August 2006 time frame?
20    A    Either Holly Hare which is initials HMH or
21 Kathy Duble. And this shows Holly Hare.
22    Q    All right. And would you agree with me that
23 on the very same date that the -- that the dispute came
24 in there's an entry that verified as RPTD?
25    A    Yes.

## Page 192

1     MR. PERR:  Well, I'm just object to the form
2  of the question because you're assuming that the
3  date that's listed here is the date that it came
4  in. It contradicts the actual --
5     MR. SOUMILAS:  Well, let's take it one step
6  at a time.
7  BY MR. SOUMILAS:
8     Q    Is verified as RPTD, verified as reported?
9     A    Yes.
10    Q    Okay. Is that your company ACCB getting back
11 to Experian and saying this account is verified as
12 accurate?
13    A    As ver -- as reported, yes.
14    Q    And Holly Hare is the one who would have done
15 the investigation at that time to get back to Experian?
16    A    That's her initials.
17    Q    Okay. You agree with me that Holly is also
18 the person who entered the dispute on your system?
19 She's the one --
20    A    It would a -- it would appear that way, yes.
21    Q    Okay. So would you agree with me that if she
22 entered it, she was the person responsible for receiving
23 it and entering that a dispute has been made?
24    A    Rephrase it?
25    Q    Yes. In other words, the fact that her

Dixon-Rollins v. Experian Information Solutions, et al.      TOM DREHER, 10/1/09

**Page 193**

1   initials are next to the receipt of the dispute would
2   that mean that it's her job to enter the fact that a
3   credit bureau dispute has been received by ACCB about
4   this account?
5      A   Yes.
6      Q   And you told me her job was also to
7   investigate that dispute and get back to Experian.
8   Correct?
9      A   Her and Kathy Duble, yes.
10      Q   Okay. You agree with me that the entry date
11   for the first notation of this credit bureau dispute is
12   August 22, 2006. Correct?
13      A   Yes.
14      Q   It's at 12:45 p.m.
15      A   Yes.
16      Q   The response is on the exact same date at the
17   exact same time in the same minute, you would agree with
18   me on that?
19      A   She's filling in the blanks, yes.
20      Q   Okay. When you say she's filling in the
21   blanks, what does that mean?
22      A   There's just certain options you fill in.
23      Q   Are you supposed to do any investigation
24   before you fill-in the blanks?
25      A   I'm presuming this is what all was done

**Page 194**

1   before, yes.
2      Q   So you are presuming that there was an
3   investigation done. It wasn't just simply received and
4   in the same minute she responded verified as reported.
5   You think that there was an investigation someplace in
6   between?
7      A   Yes, there was a big gap.
8      Q   Okay. What -- where is that investigation in
9   your records? What was investigated?
10      A   The letter from the attorney, the letter from
11   the consumer.
12      Q   Where are the entries from Holly that she
13   looked at the letters from the attorney, the letters
14   from the consumer, that she talked to anybody or looked
15   at anything?
16      A   She would have the screen right in front of
17   her.
18      Q   Is there any entry in your system that Holly
19   did anything like you just mentioned?
20      A   No, she did not. No, she did not document
21   this correctly, that's right.
22      Q   Okay. She didn't document that she did
23   anything?
24      A   Right.
25      Q   You told me the investigators would have

**Page 195**

1   their own Outlook notes and whatever it is that they do,
2   they should document. Correct?
3      A   Yeah, this was done days before.
4      Q   Okay. But you told me whatever is done in
5   the investigation is going to make its way on to the
6   work card?
7      A   Yes.
8      Q   You told me that your company takes each case
9   by its own merits and looks as to what it needs to look
10   into in order to get to the bottom of the problem.
11   Correct?
12      A   Yes.
13      Q   And if you need to speak with somebody or
14   look at certain documents, that they would do it.
15   Correct?
16      A   Yes.
17      Q   And they would memorialize whatever it is
18   that they did?
19      A   Yes.
20      Q   Holly memorialized nothing except for the
21   fact that she responded in the exact same minute that
22   she entered the dispute. Correct?
23      A   Yes.
24      Q   You never spoke with Holly about this case?
25      A   No.

**Page 196**

1      Q   Okay. So you don't know that she did
2   anything?
3      A   I only can know she worked for nine, ten
4   years and did a very thorough job. I don't know what
5   happened.
6      Q   Fair point. You don't know that she did
7   anything in connection with this Octo -- August 22, 2006
8   investigation into the Carmon Dixon disputed account?
9      A   That's correct.
10      Q   Okay. There's absolutely no record that ACCB
11   did anything to investigate this dispute. Correct?
12      A   Yes.
13      Q   All right. But it did verify to Experian
14   that the account was reported as accurate with a money
15   owing. Correct?
16      A   As reported, yes.
17      Q   Okay. And at least as far as this line is
18   concerned this doesn't say anything about it being
19   disputed. It just says verified as reported. Correct?
20      A   Yes, not adequate report -- notations.
21      Q   All right. Now, let's go to what I think is
22   the second credit bureau dispute. And that appears to
23   be May 14, 2007 when Holly handles a Trans Union dispute
24   at ten o'clock that day. Do you see that?
25      A   Yes.

49 (Pages 193 to 196)

Dixon-Rollins v. Experian Information Solutions, et al.                    TOM DREHER, 10/1/09

---

Page 197

1    Q    And at the exact same time on the exact same
2  date she also says verified as reported to Trans Union.
3  Correct?
4    A    Yes.
5    Q    All right. Now, is there anything in your
6  records here that Holly actually did anything at all to
7  investigate this Trans Union dispute in May 2007?
8    A    There's no notations.
9    Q    Okay. But if she did anything like look at
10  the lease or speak with anybody or look at the attorney
11  letters or determine anything, that should have been
12  there. Correct?
13    A    Should be notated, yes.
14    Q    So your company doesn't have any notation or
15  any information that any investigation was conducted.
16  Correct?
17    A    Yes.
18    Q    We know that in the exact same minute that
19  the dispute was first entered in your system it was also
20  responded to as being verified as reported to Trans
21  Union. Correct?
22    A    Yes.
23    Q    If Holly had spent 18 days investigating this
24  matter ahead of time, we wouldn't know anything about
25  that because there's no record of that?

---

Page 198

1    A    Yes.
2    Q    Now, it looks like Holly is handling a third
3  credit bureau dispute in May of 2007. This is on May
4  21st, 2007 through Equifax. Correct?
5    A    Yes.
6    Q    And, again, there's a notation here consumers
7  state this account was paid in full by money order prior
8  to being reported to the creditors. This amount was
9  reached and settled in full before reporting date. Do
10  you see that?
11    A    Yes.
12    Q    All right. So is that what Equifax is
13  telling ACCB about this account?
14    A    Yes.
15    Q    All right. And you would agree with me that
16  this time somebody else handles this dispute, somebody
17  with the initials KRD. You see that?
18    A    Yes.
19    Q    Who is KRD?
20    A    Kathy Duble.
21    Q    And on June -- bless you.
22    MR. PERR: Thank you.
23  BY MR. SOUMILAS:
24    Q    June 15, 2007 at 11:50 Kathy Duble says to
25  delete it. Correct? Says Equifax deleted. Do you see

---

Page 199

1  that entry?
2    A    I'm not sure what that note means. I don't
3  know if Equifax made the decision to delete it. It
4  doesn't clarify that.
5    Q    Is that an entry --
6    A    But it's been -- but it was deleted at that
7  time according to what it says.
8    Q    Is that an entry by Kathy Duble on June 15,
9  2007?
10    A    Yes.
11    Q    Okay. Is that the response to the dispute
12  that your company reached from Equifax on May 21, 2007?
13    A    It would appear that way, yes.
14    Q    Okay. All the previous credit bureau
15  disputes had an entry with a dispute and an entry with a
16  response later. Correct?
17    A    Yes.
18    Q    Okay. Why didn't as part of this response
19  your company decide to delete this account with all the
20  bureaus?
21    A    Rephrase? I'm sorry? What?
22    Q    Why in connection with this response on June
23  15th, 2007 where the account was deleted as to Equifax
24  didn't your company also delete this same account with
25  Trans Union and Experian?

---

Page 200

1    A    I do not know.
2    Q    Okay. You would agree with me that they did
3  not, in fact, delete it with Trans Union and Experian?
4    A    It does not appear so.
5    Q    Because there are more disputes that follow
6  later. Correct?
7    A    Yes.
8    Q    Okay. So let's go to what I think is the
9  fourth credit bureau dispute and that appears to be
10  January 8, 2008 from Trans Union at 10:38 a.m. Do you
11  see that, sir?
12    A    Yes.
13    Q    Okay. Would you agree with me that that
14  follows the pattern of the previous Trans Union dispute
15  where it's verified as reported in the exact same
16  minute?
17    A    It does appear that way, yes.
18    Q    And now there's a new investigator handling
19  this one, it's JCW. Correct?
20    A    Yes.
21    Q    And who is that?
22    A    Judy Walden.
23    Q    And is she with your company still?
24    A    No, she was there approximately one year.
25    Q    Why is she no longer there?

Dixon-Rollins v. Experian Information Solutions, et al.                    TOM DREHER, 10/1/09

Page 201

1      A    I don't recall.
2      Q    Did she ever complain to you that the work
3  flow for credit bureau disputes was too high for her?
4      A    I have no recall.
5      Q    Okay.  So now we have a fifth credit bureau
6  dispute coming to your firm on January 10, 2008 from
7  Experian.  Do you see that?
8      A    Yes.
9      Q    Would you agree with me that the same pattern
10 is repeated where on the exact same minute of the same
11 day the response is verified as reported.  Correct?
12     A    Yes.  I do not fully understand how the
13 transaction's done.
14     Q    All right.  With respect to now another
15 dispute I'll call it number six that is coming in on
16 June 23rd, 2008 from the Trans Union Credit Bureau.  Do
17 you see that?
18     A    Yes.
19     Q    And would you agree with me that the pattern
20 is the same that in the exact same minute your company
21 responds that the account should be verified as
22 reported?
23     A    Yes.
24     Q    Okay.  Now with respect to these credit
25 bureau -- by the way, are these all the credit bureau

Page 202

1  disputes that your company received or did it receive
2  more?
3      A    I have no way of knowing.  But this is
4  extraordinary to begin with, so I can't imagine, no.
5      Q    It's extraordinary in that there are quite a
6  few of them.  Correct?
7      A    Yes.
8      Q    Ms. Dixon is being pretty persistent about
9  this account.  Correct?
10     A    Yes, but June 27th, 2007 our client told us
11 there was no payments made.
12     Q    All right.  My question previously, sir, was
13 are these all of the credit bureau disputes that your
14 company received, these six that we just went through?
15     A    To the best of my knowledge, yes.
16     Q    And it appears that the credit bureau
17 disputes when received are entered in the work card.
18 Correct?
19     A    Yes.
20     Q    Okay.  And there's no doubt that with respect
21 to the credit bureau disputes that your company
22 understood what the dispute was in this case.  Correct?
23     A    It would appear to be, no.
24     Q    Yeah.  Okay.  It would appear to be what?
25     A    It does not, no.  Do you want me to rephrase

Page 203

1  that so I answer it right?
2      Q    Well, I mean, I just want to know when your
3  company is receiving these credit bureau disputes does
4  it understand that Mrs. Dixon-Rollins is saying that
5  this account is paid and that it should not be on her
6  credit report?
7      A    Yes.
8      Q    That -- she un -- you understand that it is a
9  dispute as to the accuracy of the account and that her
10 claim seems to be the same over and over again that it
11 was settled in a court proceeding earlier.  Correct?
12     A    All right.  And with the exception of
13 response to Equifax every time your company responded
14 that the account should be reported -- should be
15 verified on her credit bureau report as it had been
16 reported.  Correct?
17     A    Yes.
18     Q    With a $690 balance.  Correct?
19     A    Yes.
20     Q    And at least none of the entries that we see
21 in the work card say anything about the account being in
22 dispute status.  Correct?
23     A    The first time it was disputed we entered it
24 as disputed on an all three credit bureaus.

Page 204

1      Q    I'm asking whether in responding to any of
2  the disputes through the credit bureaus that we just
3  went through, the entries on your work card simply say
4  verified as reported with the exception of the Equifax
5  entry, they do not say anything else.  Correct?
6      A    Correct.
7      Q    All right.  Now, when you looked at that more
8  recent work card yesterday you didn't see any more
9  credit bureau disputes?
10     A    I don't believe so, no.
11     Q    Okay.  You're not aware whether -- are you
12 aware that Ms. Eddy's giving a deposition in this case
13 tomorrow?
14     A    Yes.
15     Q    Do you have any idea why?
16     A    Why?
17     Q    Yes.  Do you have any idea why she's giving a
18 deposition?
19     A    I'm really not sure.  I was under the
20 impression this was a request because of her initials on
21 somewhere.
22     Q    Okay.  Do you know whether -- why don't you
23 take a look at the last page of Dreher 4.  You see on
24 the bottom right?
25     A    Left.

51 (Pages 201 to 204)

**Dixon-Rollins v. Experian Information Solutions, et al.**                    TOM DREHER, 10/1/09

### Page 205

1    Q    I'm sorry. Bottom left hand page there's a
2 authorized signature Dawn Eddy?
3    A    Yes.
4    Q    Okay. Is it your understanding that when one
5 of your employees responds to a credit bureau dispute,
6 they have to put their name that they're responding to
7 it?
8    A    I'm not a hundred percent sure of the format,
9 but yes I'm sure there's accountability who they are.
10    Q    Okay. Looking at the top right-hand side
11 there is a -- some dates as to the -- just says date at
12 the very part and then it says FCRA response date. Do
13 you see that?
14    A    Yes.
15    Q    These dates are from April 2009?
16    A    Yes.
17    Q    About two months after you had notice that
18 there was a lawsuit concerning this matter. Correct?
19    A    Yes.
20    Q    You don't know whether your company handled
21 another credit bureau dispute in April of 2009?
22    A    I'm unsure.
23    Q    And, obviously, you wouldn't know what it did
24 with it. Right?
25    A    I'm unsure.

### Page 206

1    Q    Okay. You didn't do anything to -- in
2 preparing for today's deposition to learn about an April
3 2009 dispute after this lawsuit was filed?
4    A    Only aware of the March 23rd I mentioned.
5    Q    Okay. The March 23rd was not a dispute. It
6 was a communication you said from Chancellor Properties
7 to your company. Correct?
8    A    Yes.
9    Q    All right. Now focusing for a little longer
10 on these credit bureau disputes that we've seen from
11 August 2006 until -- all the ones you've seen, anyway,
12 would you agree with me that at least according to the
13 work card and the records that your company has in this
14 case there is no entry by any of your employees of any
15 investigation done for any of these disputes?
16    A    I'm unsure.
17    Q    Are you unsure whether they did anything or
18 not or are you unsure what your records say?
19    A    I'm unsure whether everything was documented
20 on to the work card.
21    Q    So something could have been done, but not
22 documented on to the work card. Correct?
23    A    That certainly is a possibility always, yes.
24    Q    But if anything was done, the practices at
25 your company is to document what was done. Correct?

### Page 207

1    A    I believe we do a very good job in that
2 regard, yes.
3    Q    And it's supposed to be documented on the
4 work card. Correct?
5    A    Yes.
6    Q    And the work card with respect to this
7 disputed account for Mrs. Dixon-Rollins does not
8 document that your company did anything with respect to
9 any of these credit bureau disputes. Correct?
10    A    I can't say that for sure. You're asking me
11 to assume because I don't know.
12    Q    Okay. Let's go through all of them again and
13 you tell me where you see that any of your employees did
14 anything to document anything that they did with respect
15 to any of the credit bureau disputes. Take a look at
16 Bates ACCB 8 and 9. They're all memorialized there.
17 And you tell me what they did.
18    A    I only can go by what's notated on here.
19    Q    So could I. Because there are no other
20 documents. So I don't see anything, do you?
21    A    As I said, I'm not aware.
22    Q    Sir, I'm not trying to be tricky here, but we
23 went through every single one of these disputes and
24 there was an entry of the dispute and in the exact same
25 minute a verified as reported response. Did you see

### Page 208

1 anything in between as to what was done?
2    A    No.
3    Q    Did you see anything before as to what was
4 done?
5    A    Okay. I will have to have my employee tell
6 you the process of the e -- the credit bureau response
7 system e-OSCAR. I believe I told you and I believe I
8 still feel as if that's a clerical function in those
9 notations that there could be time in between that or
10 before that and they're just fulfilling the fill-in the
11 spaces part of the e-OSCAR program. I've never seen the
12 system up and running, so my people take the -- as a
13 four -- four-page questionnaire to use e-OSCAR.
14    Q    Okay. With respect to the Dixon-Rollins
15 disputed account does your company have any notes, any
16 records, any information that it did any investigation
17 with respect to the credit bureau disputes that we just
18 went over?
19    A    I can only go by what the work card says.
20    Q    And the work card says what? What did your
21 company do?
22    A    Nothing's mentioned about what it did.
23    Q    Okay. Is -- would you agree with me that as
24 far as the information that you have which you told me
25 was everything as far as this account which

52 (Pages 205 to 208)

Page 209

1    Ms. Dixon-Rollins that in handling the credit bureau
2    disputes nobody from your company ever contacted
3    Mrs. Dixon-Rollins to ask for more information or for
4    any proof of payment?
5         A    It would be a standard credit of anybody who
6    says the account is paid to provide proof of payment.
7         Q    No. No. No. My question is did your
8    company go back to Mrs. Dixon-Rollins and say would you
9    please provide us some more information so we could
10   conduct our investigation? Is there any proof of a
11   contact with her in connection with any of the credit
12   bureau disputes?
13        A    No, I can't say there's any notations saying
14   that.
15        Q    Okay.
16        A    I only say that I know it's standard
17   procedure for our collectors to ask for proof of
18   payment.
19        Q    Okay. But you told me that the collectors
20   handle communications directly with a consumer.
21   Correct?
22        A    Yes.
23        Q    You told me the credit bureau disputes come
24   in not from the consumer directly, but through the
25   e-OSCAR system and the credit bureaus. Correct?

Page 210

1         A    Disputes come to us through a collector,
2    through a support person, a support person can do a
3    e-OSCAR response.
4         Q    These disputes that we saw coming into your
5    company from Equifax, Trans Union and Experian, you told
6    me they come in through the bureaus. Correct?
7         A    The notations I saw would appear to be a
8    credit reporting entities inquiring, yes.
9         Q    My question is with investigating any of
10   those disputes did your company ever go back to
11   Mrs. Dixon-Rollins and say we need some more information
12   from you in order to get to the bottom of this?
13        A    It's not noted.
14        Q    Is there any evidence or any notation or any
15   information that anyone from your company ever went to
16   Maurice her husband to ask for more information?
17        A    No, we would never do that. He's not a
18   responsible party.
19        Q    Is there any evidence or any information that
20   anyone from your company ever went back to the attorney
21   Matthew Lipman to get some more information about this
22   matter?
23        A    It's not notated, no.
24        Q    Is there any notation or any information that
25   anyone from your company ever went directly to Awbury

Page 211

1    Park Apartments to get some more information about this
2    matter?
3         A    Yes, we do know that on or around June 27th
4    our client reported to us that there's no payment been
5    made at that point.
6         Q    Okay. Was that in connection with one of the
7    credit bureau investigations?
8         A    It doesn't coin -- coincide directly by date,
9    no.
10        Q    Okay. Well, let's focus on the credit bureau
11   investigations for now. We'll go back to any other
12   investigation. With respect to the credit bureau
13   investigations is there any information or any notation
14   that your company ever went back to Chancellor and asked
15   for more information?
16        A    There's no notation.
17        Q    With respect to the credit bureau
18   investigations did your company go to any person and ask
19   for more information about this account?
20        A    There's no notation.
21        Q    Is there any notation or information that
22   your company did some research to find some lease
23   agreement for 2003 or 2004 or at least a continuation of
24   a lease into 2004?
25        A    There's no notation to that effect, no.

Page 212

1         Q    Okay. Is there any notation that your
2    company went back to the Philadelphia municipal court
3    record that Mr. Lipman said he had airEddy sent, but it
4    wasn't in the work card, to try to get that municipal
5    court record itself?
6         A    There was no notation.
7         Q    Is there any notation that your company ever
8    investigated for any documents of canceled checks or
9    paid checks or any checks that show any payment on this
10   lease or any missed payment that may have been on any
11   lease for Mrs. Carmon Dixon-Rollins?
12        A    Yes, each time we would have spoken to her we
13   would have asked for proof of payment.
14        Q    Every time you would have spoken with whom?
15        A    Carmon.
16        Q    You told me that in handling credit bureau
17   disputes that your practice is that you would never
18   speak with Carmon Dixon-Rollins.
19        A    Then I made some inaccurate statements 'cause
20   I have no idea why I would say that.
21        Q    Okay. So you're saying every time a credit
22   bureau dispute came into ACCB through say Experian or
23   Equifax or Trans Union someone would call up Carmon and
24   say, hey, Carmon we need some information about this
25   matter to investigate it?

53  (Pages 209 to 212)

Page 213

1     A    Had we done that, no.
2     Q    You've never done that. Correct?
3     A    On this case here, it does not look like
4 that, no.
5     Q    Okay. But you do it in other cases?
6     A    I believe we do.
7     Q    Okay. So in the typical credit bureau
8 dispute cases you would call up the consumer and say,
9 you know, give us some more information of a payment
10 here so we could get to the bottom of this?
11     A    Yes.
12     Q    Okay. As far as records again are concerned
13 is there any indication or any information that your
14 company researched this money order that was referenced
15 in some of the letters that the -- that the payment was
16 made by money order?
17     A    We were not aware as to who the proper entity
18 was that issued the money order.
19     Q    There was some reference that there was a --
20 some settlement out of court. Did your company ever
21 search for the settlement records as to whether there is
22 some settlement that an amount was paid?
23     A    I believe we would rely upon the debtor to do
24 that. She's the one who made the payment. She never
25 stepped forward. Never gave us a copy of anything.

Page 214

1     Q    Okay. So she never gave you a copy of
2 anything, but did your employees -- or, so you say she
3 never gave you a copy of anything. Your employees in
4 conducting their own investigations did they go and on
5 their own try to investigate what happened out of court
6 and whether there was some type of a settlement and
7 whether it was memorialized someplace?
8     A    Well, the court documents -- I don't know.
9 I'm not an expert in the court system in Pennsylvania to
10 know how the system works in that, but it's just as easy
11 for the client to give us proof of payment than to try
12 to figure it all out.
13     Q    Sir, isn't it true that with respect to the
14 credit bureau disputes there is not any information or
15 any notation in any of your records that anybody at your
16 company spoke to a single person or looked at a single
17 document in conducting an investigation?
18     A    There's nothing notated on the work card.
19     Q    What's notated is that they got back to the
20 bureaus and said the account is verified as reported
21 repeatedly except that one time when they told Equifax
22 to delete it. Correct?
23     A    Yes.
24     Q    And only Equifax to delete it, not the other
25 credit bureaus because it remained there with the other

Page 215

1 credit bureaus through 2009?
2     A    Yes.
3     Q    Okay. Now, with respect to this June 7th,
4 2005 investigation that seems to have been prompted
5 after the calls and the faxes and the letters, did your
6 company ever get to the bottom of whether Mrs. Carmon
7 Dixon-Rollins owes that $690?
8     A    The only notation I have is that June 2007
9 where the client reported to us that the payment --
10 there was no payment made.
11     Q    Forgive me. But you told me that there was a
12 June 7, 2005 investigation initiated by a manager at
13 your company. Correct?
14     A    Yes.
15     Q    Okay. In connection with that June 2005
16 investigation did ACCB ever get to the bottom of whether
17 she owed the $690?
18     A    As previously stated there's nothing
19 notated -- excuse me. Nothing notated.
20     Q    Okay. Are you saying that whatever happened
21 in 2007 was in connection with that investigation that
22 started in 2005?
23     A    I can not tell you that, no.
24     Q    All right. And do you know why there is a
25 communication in 2007 in June of 2007 between Chancellor

Page 216

1 Properties and ACCB? What prompts it in?
2     A    There is nothing notated here as to how this
3 came about other than that they reported no payment on
4 June 27th, 2007.
5     Q    Would you infer from that entry that there
6 must have been another dispute sometime in the June 2007
7 time frame otherwise there would have been no reason to
8 look into the matter further?
9          MR. PERR: Objection, calls for
10 speculation.
11          THE WITNESS: I would not know.
12 BY MR. SOUMILAS:
13     Q    Okay. Why is anybody looking into this
14 disputed account in June of 2007 at ACCB?
15     A    I can't tell you. I don't know.
16     Q    Okay. But for whatever reason there is
17 another review, if you will, and Chancellor tells you
18 what?
19     A    On June 27, 2007 Kathy Duble notated on the
20 file that the client reported there was no payment made.
21     Q    So the client is Chancellor?
22     A    Yes.
23     Q    Okay. And other than Kathy --
24     A    There's a fax in here supporting it.
25     Q    And is that the document ACCB 20, sir,

54 (Pages 213 to 216)

Dixon-Rollins v. Experian Information Solutions, et al.                    TOM DREHER, 10/1/09

Page 217

1  that we've looked at earlier?
2      A    Yes.
3      Q    Okay. So the support that ACCB has for
4  concluding that the amount is still owed as of June 2007
5  is this one-page fax from Charlene Halicki to Kathy
6  Duble who you told me was your administrative assistant.
7  Correct?
8      A    Yes.
9      Q    Okay. Nothing else besides the one -- the
10 one-page fax?
11     A    That's everything that's been attached to the
12 work card, yes.
13     Q    Given the number of disputes that you said
14 are rather high in this account, do you
15 think it would have been a good idea for someone to give
16 it a closer look and say, you know, this one-page fax
17 may not be enough. Let's get some more information out
18 of Chancellor to determine whether this thing is owed?
19     A    As to that response, I don't know what else I
20 could ask the client to do.
21     Q    Okay. So the one page that's at ACCB 20 that
22 says, hi, Kathy, I do not have any record of Carmon
23 Dixon's account being paid in full. The balance we have
24 for her is $690. That's good enough?
25     A    That's the way -- that's our established

Page 218

1  policy, yes.
2      Q    Okay. So this was handled according to
3  established policy at ACCB. This account here for
4  Mrs. Dixon-Rollins was not a deviation. Correct?
5  Sometimes somebody drops the ball or somebody --
6  sometimes a computer error is made. That's not this
7  case. This was handled according to policy. Is that
8  your testimony?
9      A    I believe it is, yes.
10     MR. SOUMILAS: Okay. I don't know if I have
11 any more questions, sir, but let's take a
12 two-minute break so I can take a look at my notes
13 and I think we're done.
14     MR. CRUZ: We're off the video record.
15 (Thereupon a recess was taken after which the deposition
16 continued as follows:)
17     MR. SOUMILAS: We are going to go on the
18 record and close this record off. I would
19 appreciate it, if you could read the e-mail that
20 you sent her. Okay?
21     MR. LUCKMAN: Yeah. Do you want to give her
22 a couple minutes?
23     MR. SOUMILAS: You want to give her more?
24     MR. LUCKMAN: Not my deposition. I don't
25 care what you do. I was just giving you some legal

Page 219

1  advice,
2      MR. SOUMILAS: No, I don't. I think she has
3  been an absentee and you snooze you lose. That's
4  the way I see it.
5      MR. LUCKMAN: Go ahead.
6      MR. SOUMILAS: Yeah, and I would win that
7  argument with this judge ten of ten times.
8      Okay. Let's go on the record. Were we on
9  the record this whole time? Fine. It's been more
10 than ten minutes since the last question. I have
11 no further questions. We've conferred and I think
12 Mr. Luckman has no questions, Mr. Perr has no
13 questions. We've been trying to find counsel for
14 Chancellor Properties who is not on the telephone
15 and has not called back and Mr. Luckman also sent
16 an e-mail to her telling her that we're closing off
17 this record and as of this time we still have not
18 heard anything from her, so I'm prepared to close
19 this record unless anybody else who's actually
20 present has any questions.
21     Okay. Not hearing anything, we're done.
22                   STIPULATIONS
23     IT WAS STIPULATED BETWEEN counsel for the
24 respective parties, with the consent of the witness,
25 that reading and signing of the foregoing deposition by

Page 220

1  the witness be waived.
2      EREUPON, the deposition of TOM DREHER, taken
3  at the instance of MR. SOUMILAS concluded.
4      NOTE: The original and one copy of the
5  foregoing deposition will be held by MR. SOUMILAS; copy
6  to MR. PERR.

55 (Pages 217 to 220)