**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CARMEN DIXON-ROLLINS** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **EXPERIAN INFORMATION SOLUTIONS,** | : | **NO.  09-0646** |
| **INC.,** *et al* | : | |

## MEMORANDUM OPINION

**Savage, J.**                                                              **September 23, 2010**

In its post-trial motion seeking a judgment of acquittal or a new trial, defendant Trans Union, LLC ("Trans Union") challenges the jury verdict finding that it had negligently and willfully violated the Fair Credit Reporting Act, 15 U.S.C. § 1681i  ("FCRA"), when it failed to remove an erroneous collection account from the plaintiff Carmen Dixon-Rollins's ("Dixon-Rollins") credit report.  It claims that there is insufficient evidence from which a jury could conclude that it negligently failed to reinvestigate Dixon-Rollins's disputes regarding the erroneous collection account.  It also contends that there is no evidence of a willful violation of the FCRA necessary to support the award of punitive damages.  Alternatively, it argues that the punitive damages award should be reduced as unconstitutional.

Any reasonable jury could have concluded that Trans Union negligently and willfully failed to reinvestigate Dixon-Rollins's disputes in violation of the FCRA.  Likewise, there is ample evidence of willfulness to support the jury's award of punitive damages.  However, because the amount of punitive damages awarded to Dixon-Rollins is not reasonable and proportionate to the harm inflicted, we shall reduce the award from $500,000 to $270,000.

## Background

The credit information that was reported arose from a landlord-tenant dispute

between Dixon-Rollins and her former landlord.  In June 2004, Dixon-Rollins vacated an apartment she leased from Awbury Park Apartments ("Awbury Park") without paying her last month's rent.  Awbury Park filed a lawsuit to collect the amount it believed was still owed on the lease.  Chancellor Properties ("Chancellor"), the management company for the apartment complex, referred the debt for collection to Associate Credit and Collection Bureau, Inc. ("ACCB").  ACCB, in turn, reported the collection account to Trans Union which listed the account as an outstanding debt on Dixon-Rollins's credit report.[1]

Through their attorneys, Dixon-Rollins and Awbury Park settled the lawsuit prior to trial in October 2004 for $530.  Pursuant to the settlement agreement, Dixon-Rollins paid Awbury Park the agreed amount with a money order.  Awbury Park advised neither Chancellor nor ACCB that the debt was satisfied.  Trans Union continued to list the debt as an outstanding collection account of $690.

In 2005, Dixon-Rollins was notified by a credit monitoring service that the debt was still listed on her credit report.  She disputed the collection account on four separate occasions, submitting written disputes to Trans Union on May 8, 2007, December 12, 2007, May 28, 2008, and July 28, 2008.  On each occasion, Trans Union sent an automated customer dispute verification form ("ACDV") to ACCB.[2]  ACCB responded to each inquiry by checking a box on the ACDV form, which verified that the debt remained

---

[1]Dixon-Rollins sued Trans Union, Experian Information Solutions, Inc. ("Experian"), ACCB and Chancellor for violations of the FCRA.  The plaintiff settled with Experian on September 8, 2009, and ACCB and Chancellor on February 18, 2010.  Trans Union was the only defendant to go to trial.

[2] An ACDV is a form used by consumer reporting agencies to verify the accuracy of a disputed account.  Once a consumer disputes an entry in her credit report, consumer reporting agencies forward an ACDV describing the dispute to the original source. The original source verifies the disputed information by checking a box on the ACDV form indicating the adverse account is accurate.

outstanding. Relying solely on ACCB's verification without any attempt to corroborate it, Trans Union continued to report the collection account on Dixon-Rollins's credit report until May 2009.

Dixon-Rollins initiated this action, alleging that Trans Union violated the FCRA by negligently and willfully failing to reinvestigate inaccurate information included in her credit report, and to employ reasonable procedures to assure maximum possible credit reporting accuracy. On March 8, 2010, after a two day trial, the jury returned a verdict in favor of Dixon-Rollins. It awarded her $30,000 in actual damages and $500,000 in punitive damages. Trans Union filed a timely post-trial motion seeking judgment as a matter of law, or alternatively, a new trial on damages and a reduction in the punitive damages award.

## Standard of Review

Judgment as a matter of law can be granted only where there is no legally sufficient evidentiary basis for a reasonable jury to find in favor of the verdict winner. *Foster v. Nat'l Fuel Gas Co.*, 316 F.3d 424, 428 (3d Cir. 2003) (citing Fed. R. Civ. P. 50(a)(1)). Thus, a jury verdict will not be disturbed unless the record is "'critically deficient of that quantum of evidence from which a jury could have rationally reached its verdict.'" *LePage's Inc., v. 3M*, 324 F.3d 141, 146 (3d Cir. 2003) (quoting *Swineford v. Snyder County*, 15 F.3d 1258, 1265 (3d Cir. 1994)). In determining whether a jury's verdict is supported by a sufficient evidentiary basis, the court must draw all reasonable inferences in favor of the verdict winner. *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 150 (2000).

At the conclusion of Dixon-Rollins's case in chief, Trans Union moved for judgment as a matter of law. After the motion was denied, Trans Union proceeded to offer evidence in its own defense. Consequently, we consider the record as it stood at the close of all the

evidence.  *See Trs. of Univ. of Pennsylvania v. Lexington Ins. Co.*, 815 F.2d 890, 903 (3d Cir. 1987).

Only where "the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience" can a new trial be granted for insufficiency of the evidence.  *Marra v. Phila. Hous. Auth.,* 497 F.3d 286, 307 n. 18 (3d Cir. 2007) (quoting *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991)).  A trial court may not substitute its judgment of the facts and its own credibility determinations for that of the jury. *Reeves.* 530 U.S. at 150; *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 211 (3d Cir. 1992).

### Reinvestigation

When a consumer disputes the completeness or accuracy of any information contained in her credit report, the consumer reporting agency must conduct a reinvestigation.  If the reinvestigation reveals that the information is inaccurate or cannot be verified, the consumer reporting agency must promptly delete the information. 15 U.S.C. § 1681(i)(a).  Failure to conduct a reasonable reinvestigation violates the FCRA. *Cushman v. Trans Union Corp.,* 115 F.3d 220, 223-24 (3d Cir. 1997).

The burden to conduct the reinvestigation is on the credit reporting agency.  It cannot be shifted back to the consumer. *Id.* at 225.

A credit reporting agency's reinvestigation obligation is to verify the accuracy of its original source of information.  This duty may include going beyond the original source. Whether the credit reporting agency must go beyond the original source depends on a number of factors, including: (1) whether the consumer has alerted the consumer reporting agency that the original source may be unreliable; (2) whether the consumer reporting

4

agency itself knows or should know that the original source is unreliable; and (3) the comparative costs of verifying the accuracy of the original sources versus the potential harm the inaccurate information may cause the consumer. *Id.* Whether the credit reporting agency failed to fulfill its duty to reinvestigate is for the jury to decide. *Id.* at 226.

As part of its reinvestigation, a consumer reporting agency must provide the original source of derogatory information with notice of the consumer's dispute. 15 U.S.C. § 1681i (a)(2). The notice "shall include all relevant information regarding the dispute that the agency has received from the consumer." *Id.*

The FCRA imposes liability for damages, costs, and attorney's fees against "any person who is negligent in failing to comply with any" of its provisions. 15 U.S.C. § 1681o. Furthermore, willful non-compliance with the FCRA permits an award of punitive damages. 15 U.S.C. § 1681n.

Trans Union argues that there is no evidence from which a jury could conclude that it negligently failed to comply with its reinvestigation duties under § 1681i. It claims that the FCRA does not require it to do more than verify a debt with the original source. Thus, according to Trans Union, it satisfied its reinvestigation duties under § 1681i when it sent ACDVs to ACCB in response to each of Dixon-Rollins's disputes.

Trans Union's argument that the FCRA never requires it to go beyond verifying the debt with the original source was rejected by the Third Circuit in 1997, in *Cushman v. Trans Union Corp.*, 115 F.3d at 225, a case in which Trans Union made the same argument it now makes. Despite the clear rejection of its position then, Trans Union vainly argues that the *Cushman* decision is no longer good law because the Third Circuit did not consider amendments to the FCRA made by the Consumer Credit Reporting Reform Act of 1996.

According to Trans Union, the 1996 amendments "placed the investigation burden squarely" on the original source of credit information. *Def. Brief,* p. 13. Trans Union contends that these amendments implicitly lowered the reinvestigation obligations of consumer reporting agencies when they raised the investigation obligations for original sources. In support of its position, Trans Union cites *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147 (9th Cir. 2009). In *Gorman*, the Ninth Circuit stated that the "CRA's 'reasonable reinvestigation' consists largely of triggering the investigation by the furnisher." *Id.* at 1156. It also stated in *dicta* that because original sources have a direct relationship with consumers, Congress intended them to conduct a more exacting investigation than consumer reporting agencies. *Id.* at 1157. However, the Ninth Circuit did not state that the 1996 amendments relieved the consumer reporting agencies of their own reinvestigation duties.[3]

The fact that Congress chose to impose a higher duty to investigate on original sources does not mean that it intended to diminish the reinvestigation obligations of consumer reporting agencies. There is nothing in the statute or legislative history that supports a conclusion that the 1996 amendments to the FCRA diminished the credit reporting agencies' reinvestigation duties. Courts in this district have consistently applied *Cushman's* requirement that consumer reporting agencies may be required to go beyond the original source of credit information. *See, e.g., Krajewski v. Am. Honda. Fin. Corp.,* 557 F. Supp. 2d 596, 616 (E.D. Pa. 2008); *Crane v. Trans Union*, *L.L.C.*, 282 F. Supp. 2d 311,

---

[3] Tran Union also cites *Chiang v. Verizon New England Inc.,* 595 F.3d 26 (1st Cir. 2010), to support its argument that the 1996 amendments reduced credit reporting agencies reinvestigation duties. There is nothing in *Chiang* to support this conclusion.

320 (E.D. Pa. 2003); *Lawrence v. Trans Union, L.L.C.*, 296 F. Supp. 2d 582, 589 (E.D. Pa. 2003); *Evantash v. Chase Manhattan Bank, U.S.A., N.A.,* No. 02-1188, 2003 WL 22844198, at *5 (E.D. Pa. Nov. 25, 2003). Indeed, the Third Circuit recently confirmed that a reasonable reinvestigation "must mean more than simply . . . making only a cursory investigation into the reliability of information that is reported to potential creditors." *Cortez v. Trans Union, LLC,* Nos. 08-2465, 08-2466, 2010 WL 3190882, at *16 (3d Cir. Aug. 13, 2010) (citing *Cushman*, 115 F.3d at 225).

Notwithstanding Trans Union's arguments to the contrary, it had an obligation to look beyond ACCB's verification. It failed to do so.

Dixon-Rollins testified that she disputed the erroneous ACCB collection account with Trans Union on four occasions. Trans Union did not dispute Dixon-Rollins's testimony and proffered no evidence that it went beyond contacting ACCB, the original source, to verify the account or that the costs of doing so would have been high.

Dixon-Rollins provided Trans Union a letter from her attorney verifying that the ACCB account had been settled, a receipt of the money order used to settle the debt, and contact information for various individuals familiar with the settlement.[4] Trans Union did not forward any of this information to ACCB despite its duty to send all "relevant information regarding the dispute" received from the consumer. 15 U.S.C. § 1681i(a)(2). In fact, Steven Newnom, a Trans Union team leader, testified that Trans Union, as a matter of policy, never forwards material submitted by consumers to the original source. *Newnom*

---

[4] Dixon-Rollins provided the names of the following individuals with purported knowledge of the settlement: Matthew Lippman, plaintiff's former attorney; Christy Williams, former manager of Awbury Park; and J. Cooperman, of Chancellor. *Dixon-Rollins Trial Tr.* at 25-26.

*Trial Tr.* at 98-99.  Based upon this undisputed evidence, a reasonable jury could have concluded that the material submitted by Dixon-Rollins was relevant to the status of her debt, and Trans Union negligently and willfully failed to forward it to ACCB for verification.

Trans Union argues that even if its reinvestigations into Dixon-Rollins's disputes were inadequate, there is no evidence that a more thorough reinvestigation would have produced different results.  It claimed that Awbury Park failed to record receipt of Dixon-Rollins's money order.  In support of this argument, Trans Union provided evidence that in December 2007, Dixon-Rollins sent Chancellor a letter disputing the debt, enclosing a letter from her attorney stating that the Awbury Park debt had been satisfied.  Despite receiving this information, Chancellor continued to report the debt as outstanding because its "records indicate[d] that [Dixon-Rollins] owe[d] a balance of $690." *Trial Exh.* 48.  Therefore, Trans Union argues that even if it had contacted Chancellor or Awbury Park directly or sent the supplemental information provided by Dixon-Rollins, the entities would have continued to assert that the debt remained unpaid.

To impose liability for failing to reinvestigate the disputed collection account, there must be sufficient evidence for the jury to reasonably conclude that Trans Union would have discovered the error if it had undertaken a reasonable reinvestigation. *Cortez*, 2010 WL 3190882, at *15.  Here, it was not unreasonable for the jury to conclude that if Trans Union had contacted Chancellor or Awbury Park directly, it would have discovered the accounting error or caused Chancellor or Awbury Park to conduct a more thorough investigation.  Armed with the supplemental information supplied by Dixon-Rollins, Chancellor and Awbury Park could have compared it with their records and inquired of their attorneys.  At the very least, even if Chancellor and Awbury Park had verified the debt, the

8

jury may have reasonably decided that Trans Union was negligent for not deleting the adverse account in light of the conflicting supplemental material provided by Dixon-Rollins. *See* 15 U.S.C. § 1681i(a)(5)(A)(i) (if after a reinvestigaiton a consumer reporting agency can not verify the information, it must delete the item); *Cortez*, 2010 WL 3190882, at *6 ("Trans Union controls the information it places on a consumer's credit report.").

<u>Compensatory Damages</u>

Trans Union argues that the $30,000 award of actual damages is unsupported by the evidence.  It claims that Dixon-Rollins was unable to show that she suffered any financial, emotional, or defamation damages as a result of the erroneous credit report.

With respect to financial damages, Trans Union contends that Dixon-Rollins failed to prove that she received a higher interest rate on her mortgage as a result of the erroneous credit report.  This argument is groundless.  Jarred Nelson, former branch owner of Gateway Funding, testified that he gave Dixon-Rollins a mortgage rate of five and one-half percent instead of five percent because of the ACCB collection account appearing on her credit report. *Nelson Trial Tr.* at 21, 24.  According to Nelson, the higher rate increased the cost of the loan by $15,087.60 over its term.  *Nelson Trial Tr.* at 27.  Trans Union argues that Nelson's testimony was contradictory and should have been disregarded. Even if it was, we may not substitute our judgment for the jury's.  *Fineman*, 980 F.2d at 211.  Assessing the credibility of a witness is left to the jury. *Norfolk Southern Ry. Co., v. Basell USA Inc.,* 512 F.3d 86, 96 (3d Cir. 2008).

Trans Union also claims that Dixon-Rollins failed to provide evidence that she suffered emotional distress.  Specifically, it argues that Dixon-Rollins failed to allege that she suffered an actual injury, a prerequisite to recovery for emotional distress.  Therefore,

according to Trans Union, because Dixon-Rollins did not suffer a physical injury, her claim for emotional distress can not be used to support the compensatory award.

Notwithstanding Trans Union's argument to the contrary, an FCRA plaintiff need not state her emotional damages with particularity. *Philbin v. Trans Union Corp.,* 101 F.3d 957, 963 n. 3 (3d. Cir. 1996). Humiliation and embarrassment are cognizable injuries under the FCRA; and there is no requirement that a plaintiff provide corroborating evidence or medical testimony in support of an award of damages. *Cortez*, 2010 WL 3190882, at *22 (citations omitted). Thus, Dixon-Rollins was entitled to recover for humiliation and embarrassment even if she had incurred no out-of-pocket expenses. *Id.*

Dixon-Rollins presented evidence that the erroneous collection account was "affecting [her] credibility and character." *Dixon-Rollins Trial Tr.* at 23. She also complained that the collection account was "assassinat[ing]" her "character" and she did not have the right to "defend [against] it." *Dixon-Rollins Trial Tr.* at 24. From this testimony, the jury could have reasonably concluded that Dixon-Rollins was humiliated and embarrassed as a result of the collection account appearing in her credit report after repeated attempts to have it removed. At the very least, she is entitled to damages suffered in connection with her efforts to correct the error in Trans Union's credit report. *See Cortez*, 2010 WL 3190882, at *22 ("Time spent trying to resolve problems with the credit reporting agency may also be taken into account."); *Sheffer v. Experian Solutions, Inc.,* No. 02-76404, 2003 WL 21710573, at *3 (E.D. Pa. July 24, 2003) (plaintiff may be entitled to damages for emotional distress suffered in connection with trying to correct the error).

Trans Union also argues that Dixon-Rollins failed to make out a claim for

defamation.[5]  According to Trans Union, Dixon-Rollins did not prove that she was injured by the inclusion of the collection account in her credit report.

To make out a claim for defamation in Pennsylvania, a plaintiff must show harm resulting from the publication of defamatory material.  42 Pa.C.S. § 8343.  A plaintiff alleging slander must show "'special harm.'" *Manno v. American General Fin. Co.,* 439 F. Supp. 2d 418, 434 (E.D. Pa. 2006) (quoting *Dougherty v. Boyertown Times,* 547 A.2d 778, 782 (Pa. Super. 1988)).  Special harm includes "actual and concrete damages capable of being estimated in money, established by specific instances such as actual loss due to withdrawal of trade or particular customers, or actual loss due to refusal of credit by specific persons, all expressed in figures." *Beverly v. Trump*, 182 F.3d 183 (3d Cir. 1999) (citing *Altoona Clay Prod., Inc. v. Dunn & Bradstreet, Inc.,* 246 F. Supp. 419 (W.D. Pa. 1965)), *rev'd on other grounds*.

Trans Union's argument that there was insufficient evidence that Dixon-Rollins was injured by its publication of her credit report is contradicted by the record.  As noted earlier, the jury had evidence of the higher cost of the mortgage, and the emotional distress caused by the publication of the erroneous credit report.

Trans Union has failed to demonstrate that the jury's verdict is "critically deficient" of the necessary evidence to prove it negligently failed to comply with the FCRA.  *Feldman*, 43 F.3d at 828.  On the contrary, the record supports a conclusion that Trans Union failed to conduct a reasonable reinvestigation, causing Dixon-Rollins financial and emotional

---

[5] Dixon-Rollins also alleged damages for lost credit opportunities, which constitutes compensable harm under the FCRA.  *See Philbin*, 101 F.3d 957.  However, she provided no evidence to support this theory and we do not consider it in our analysis.

harm.

## Punitive Damages

Any person who willfully fails to comply with any requirement of the FCRA may be liable for punitive damages. 15 U.S.C. § 1681n.  To establish willful noncompliance, a plaintiff must prove that the defendant "'knowingly and intentionally committed an act in conscious disregard for the rights of others' but need not show 'malice or evil motive.'" *Cushman*, 115 F.3d at 226 (quoting *Philbin,* 101 F.3d at 970).  Reckless disregard of an FCRA requirement qualifies as a willful violation. *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 71 (2007).

A finding of willfulness requires more than an incorrect or careless reading of the statute. *Id.* at 69.  Only an "objectively unreasonable" reading is deemed willful. *Id.* at 70. Where the reading has "a foundation in the statutory text and a sufficiently convincing justification," it is not an objectively unreasonable interpretation even if a court disagrees with that reading. *Id.* at 69-70.  In contrast, where the defendant "had the benefit of guidance from the courts of appeals or [a regulatory agency] that might have warned it away from the view it took," the reading is unreasonable. *Id.* at 70.  Whether an act was done with knowing or reckless disregard for another's rights remains a fact-intensive question.  *Whitfield v. Radian Guar., Inc.,* 501 F.3d 262, 271 (3d Cir. 2007) (whether a defendant acted wilfully is a factual issue, not a question of law, and can not be decided by a district court as a matter of law), *vacated as moot*, 128 S. Ct. 2901 (2008).

Trans Union argues that there is insufficient evidence to support a finding of a willful

violation of the FCRA.[6]  It claims that its reinvestigation into Dixon-Rollins's disputes was conducted in accordance with its normal procedures, which were modeled on its reasonable understanding of its duties under the FCRA.  It contends that based on the FCRA text, regulatory guidance and relevant case law, it had no warning that its reinvestigation procedures were objectively unreasonable.

Trans Union's claim that the statutory text did not provide any warning that its reinvestigation procedures were insufficient is wrong.  Section 1681i(a)(2) specifically states that a consumer reporting agency has a duty to forward all "relevant information" that it receives from the consumer to the original source of the dispute. 15 U.S.C. § 1681i(a)(2).  Despite this mandate, Trans Union's policy is not to forward any information it receives from any consumer disputing information in the report. *Newnom Trial Tr.* at 98. Further, the statute clearly states that a consumer reporting agency must delete or modify any information included on a credit report that it cannot verify. 15 U.S.C. § 1681i(a)(5)(A)(i).  Here, even after receiving supplemental documentation from Dixon-Rollins indicating that the debt had been satisfied, Trans Union did not delete the account and continued to report it as in collection.

With respect to regulatory guidance, Trans Union submitted the Fair Trade Commission's ("FTC") Report to Congress on the Fair Credit Reporting Act Dispute Process ("FACTA Report") as support for its reinvestigation procedures.  The FACTA

---

[6] Trans Union argues that before a willfulness charge can be submitted to a jury, the court must make a threshold legal determination that Trans Union's actions were objectively unreasonable.  It points out that to the extent that the Third Circuit's decision in *Whitfield* states that this is a factual question for a jury, it is not authoritative because the decision was vacated by the Supreme Court.  Whether the "objectively unreasonable" test is a question of law or a question of fact is irrelevant to our analysis.  There is sufficient evidence to support a finding of willfulness in any event.

Report analyzed the extent to which consumer reporting agencies and furnishers of credit information were complying with the requirements of the FCRA.  Trans Union quotes a portion of the FACTA Report in which the FTC states that it is unable to conclude whether credit reporting agencies are forwarding supplemental material to original sources of credit information.

The fact that the FTC could not determine whether consumer reporting agencies were forwarding supplemental material in no way supports a conclusion that they have no obligation to do so.  Because other credit reporting agencies do not comply with the law does not excuse Trans Union from doing so.  Indeed, § 1681i(a)(2) specifically requires them to do so.  Moreover, the same passage cited by Trans Union also notes that "in certain situations, the failure to convey the actual documents may lead to incorrect outcomes." FACTA Report at 33-34.  Thus, the FACTA Report provides no support for Trans Union's policy of refusing to forward supplemental dispute material.

Significantly, the Third Circuit had already warned Trans Union that its reinvestigation procedures were deficient. The *Cushman* decision clearly instructs consumer reporting agencies that they must go beyond the original source in certain circumstances. Trans Union's attempt to avoid that instruction by citing another circuit's decision that is not on point is unavailing.  Indeed, its argument suggests that it had no intention of correcting its reinvestigation procedures.  It cannot avoid its obligations by creating an illusory exception.  Thus, there is ample evidence to support a legal and factual determination that Trans Union's procedures are objectively unreasonable.

There was also sufficient evidence that Trans Union wilfully or recklessly violated its duties with respect to Dixon-Rollins.  Trans Union's refusal to forward Dixon-Rollins's

14

supplemental material to ACCB may be considered a willful or reckless violation of the FCRA. *See Crane,* 282 F. Supp. 2d at 321 ("a reasonable jury could conclude that TU's refusal to transmit . . . supplemental documentation was either knowingly or recklessly in contravention of [plaintiff's] FCRA rights."); *Lawrence*, 296 F. Supp. 2d at 590 (citing *Crane* and declining to grant summary judgment on claim for punitive damages where Trans Union refused to forward supplemental material).

It was not unreasonable for the jury to conclude that Trans Union wilfully or recklessly violated the FCRA by doing nothing more than "parroting information" it received from ACCB. *Cushman,* 115 F.3d at 225 ("[A] 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Campbell v. Chase Manhattan Bank, USA, N.A.,* No. 02-3489, 2005 WL 1514221, at *16 (D.N.J. June 27, 2005) (parroting information received from original source may be considered a willful violation of the FCRA).  Thus, there is no basis to disturb the jury's finding that Trans Union wilfully or recklessly failed to comply with the FCRA.

## Amount of Punitive Damages Award

Trans Union argues that the award of $500,000 in punitive damages must be reduced as a matter of law because it violates the Due Process Clause of the United States Constitution.

The Due Process Clause of the Fourteenth Amendment prohibits imposing "grossly excessive or arbitrary punishments" on civil defendants. *State Farm Mut. Auto. Ins. Co. v Campbell*, 538 U.S. 408, 416 (2003).  In determining whether an award of punitive damages is grossly excessive, we consider the following three "guideposts": "(1) the degree of reprehensibility of the defendant's misconduct, (2) the disparity between the actual or

potential harm suffered by the plaintiff and the punitive damages award, and (3) the difference between the punitive damages awarded by the [factfinder] and the civil penalties authorized or imposed in comparable cases." *Id.* at 418.

The degree of reprehensibility of the defendant's conduct is the most important consideration in determining the appropriateness of a punitive award. *Id.* at 419. The following factors are relevant to the reprehensibility analysis: (1) whether the harm was physical or economic; (2) whether the conduct showed an indifference or reckless disregard for the health or safety of the plaintiff; (3) whether the target of the defendant's conduct was financially vulnerable; (4) whether the conduct was an isolated incident or involved repeated actions; and (5) whether the harm was caused by intentional malice, trickery, or deceit, or was merely the result of negligence. *Id.* The existence of any one of these factors does not necessarily sustain an award of punitive damages, but "the absence of all of them renders any award suspect." *Id.*

Of these factors, only two, repetitive conduct and financial vulnerability, are present. However, the degree to which these factors are present  favors the imposition of punitive damages.

There is no evidence that Dixon-Rollins suffered any physical injury as a result of Trans Union's credit report.  Embarrassment and humiliation are not the types of physical injuries contemplated under the reprehensibility analysis. *See Jurinko v. The Medical Protective Co.,* 305 Fed.Appx. 13, 26 (3d Cir. 2008); *Bach v. First Union Nat. Bank*, 149 Fed. Appx. 354, 364 (6th Cir. 2005).  Similarly, because Trans Union's actions were economic in nature, its conduct does not display an indifference or reckless disregard for the health and safety of others. *Id.*; *Bach* at 364.  Therefore, neither the first nor second

factor supports a finding that Trans Union's conduct was reprehensible.

The third reprehensibility factor, financial vulnerability, favors Dixon-Rollins. She testified that because her husband had poor credit as a result of a prior divorce, her family relied exclusively on her credit worthiness. *Dixon-Rollins Trial Tr.* at 17. The importance of Dixon-Rollins's credit to her family made her vulnerable to Trans Union's erroneous report. Trans Union argues that this reprehensibility factor should not count in Dixon-Rollins's favor because she was not specifically targeted. It claims that its reinvestigation procedures are uniformly applied to all consumers, regardless of their financial vulnerability.

There is disagreement whether the third reprehensibility factor requires the plaintiff to be specifically targeted by the defendant's conduct. *Compare Bach* at 365 (financial vulnerability factor does not require defendant to target the victim specifically because of her vulnerability), *with Exxon Valdez v. Exxon Mobile Corp.*, 490 F.3d 1066, 1087 (9th Cir. 2007) ("The notion of 'targeting' connotes some element of intent to harm particular individuals or categories of individuals."). Here, although Dixon-Rollins was injured by Trans Union's parroting policy, she was not an intentional target. Nevertheless, because Trans Union was well aware of Dixon-Rollins's specific disputes and repeatedly failed to conduct proper reinvestigations with respect to them, we cannot agree that this factor is irrelevant. Thus, we shall take into account Dixon-Rollins's financial vulnerability in our reprehensibility analysis.

The fourth reprehensibility factor, the defendant's repeated conduct, weighs against Trans Union. Trans Union's failure to properly reinvestigate Dixon-Rollins's dispute was not an isolated incident. Indeed, it has repeatedly failed to carry out its statutory duty

despite the rejection of the same argument it now repeats and admonishments that its reinvestigations were deficient. In 1997, the Third Circuit instructed Trans Union that it may not just repeat information it receives from the original source, but must do more to verify the credit information. *Cushman*, 115 F.3d at 225. Since *Cushman* was decided, Trans Union has been repeatedly warned of its statutorily required obligation in conducting a reinvestigation, s*ee e.g., Krajewski,* 557 F. Supp. 2d at 616; *Crane*, 282 F. Supp. 2d at 320; *Lawrence*, 296 F. Supp. 2d at 589; *Saenz v. Trans Union, LLC,* 621 F. Supp. 2d 1074, 1083 (D. Or. 2007) (Trans Union must do more than parrot information received by original source); *Lambert v. Beneficial Mortgage Corp.,*No 05-5468, 2007 WL 1309542, at *2 (W.D. Wash. May 7, 2007) (in certain circumstances a consumer reporting agency may need to verify the accuracy of its initial source of information) (citations omitted), and found liable for noncompliance. *See, e.g., Mullins v. Equifax Info. Servs., LLC*, No. 05-888, 2007 WL 2471080, at *7 n. 11 (E.D. Va. Aug. 27, 2007).[7] Thus, because Trans Union has been warned of its inadequate reinvestigation practices in prior cases, it may be considered a repeat FCRA offender. *See Willow Inn, Inc.*, *v. Public Serv. Mut. Ins. Co.*, 399 F.3d 224, 232 (3d Cir. 2005) (recidivist behavior relates to defendant's conduct as to non-parties).

Trans Union's refusal to modify its reinvestigation procedures and insistence on mimicking the original sources' responses supports the conclusion that punitive damages

---

[7] Trans Union has also been warned repeatedly about its obligation under § 1681i(a)(2)(B) to forward all relevant material provided by the consumer to the original source. *See, e.g., Crane,* 282 F. Supp. 2d at 321; *Lawrence*, 296 F. Supp. 2d at 590; *Saenz*, 621 F. Supp. 2d at 1084. Nevertheless, Steve Newnom testified that Trans Union does not forward supplemental material provided by consumers as a matter of policy. *Newnom Trial Tr.* at 98 Thus, even after receiving numerous warnings, Trans Union continues to ignore its obligation to forward relevant material provided by consumers to the original source further supporting the conclusion that it is a repeat FCRA violator.

are necessary to deter future violations.   "[E]vidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." *BMW of N. Am., Inc., v. Gore*, 517 U.S. 559, 576-77 (1996).  Thus, because Trans Union has continued to disregard its obligations despite clear judicial rulings and warnings, its conduct is more reprehensible than that of a first time offender, requiring more severe punishment. *Id.* at 577.

The final factor, intentional malice, trickery, or deceit, is absent.   There is no evidence that Trans Union's actions involved malice, trickery, or deceit.  Dixon-Rollins does not disagree, but argues that the absence of this final factor should not be given any weight because punitive damages are available under the FCRA merely by showing willful or reckless conduct.  Although the FCRA permits punitive damages on a showing of willful or reckless conduct, the final factor still remains relevant for evaluating the degree of reprehensibility. *See Bach,* 149 Fed. Appx. at 366 (while actions may be reckless, they do not support a finding of intentional malice, trickery, or deceit).  Therefore, the absence of the fifth factor favors Trans Union.

The second guidepost is a comparison of the amounts of the compensatory and punitive damages.  Although there is no "mathematical bright line" as to the proper ratio between punitive and compensatory awards, the ratio must be reasonable. *Gore,* 517 U.S. at 538.  Few awards exceeding a single digit ratio between punitive and compensatory damages will be constitutional. *State Farm*, 538 U.S. at 425.  Indeed, "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *Id.* (citing *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23-24

19

(1991)).

Although single digit multipliers are more likely to be constitutional, a greater ratio may be appropriate where an egregious act results in only a small amount of economic damages. *Id.* 538 U.S. at 425  (quoting *Gore*, 517 U.S. at 582).  However, if an award of economic damages is substantial, "a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.*  Ultimately, the appropriate ratio must be based on the particular facts and circumstances of the defendant's conduct and the plaintiff's injury. *Id.*

The ratio of punitive to compensatory damages awarded to Dixon-Rollins is 16.67-to-1.  Because this exceeds the single digit ratio appropriate for most punitive awards, we must carefully evaluate the facts of the case to assure that due process concerns are addressed.

Trans Union argues that because Dixon-Rollins received a "substantial" compensatory award of $30,000, the punitive award should be reduced to a ratio of 1-to-1. The compensatory damages, although not nominal, were hardly substantial.  Dixon-Rollins disputed the erroneous collection account with Trans Union over a period of five years. During this period, Trans Union failed to conduct a reasonable reinvestigation or delete the account.  Dixon-Rollins suffered economic, reputation, and emotional damages as a result of Trans Union's conduct.  Based on this evidence, we can not conclude that an award of $30,000 was substantial or that a ratio of 1-to-1 is appropriate. *See, e.g., Cortez*, 2010 WL 3190882 (upholding a 2-to-1 ratio); *Mullins,* 2007 WL 2471080, at *7 (allowing the plaintiff to recover $100,000 in punitive damages despite receiving $20,000 in compensatory damages).

The third and final guidepost requires consideration of the disparity between the punitive damages award and the civil or criminal penalties imposed in comparable cases. *State Farm* at 418.  The maximum civil penalty the FTC can pursue for knowing violations of the FCRA is $2,500 per violation.  15 U.S.C. § 1681s(a)(2)(A).  However, because this limit does not apply to actions brought by private citizens, the third guidepost is not particularly helpful in assessing the constitutionality of punitive damages awards under the FCRA. *See Cortez,* 2010 WL 3190882, at *26 (third guidepost not useful in FCRA cases); *Bach,* 149 Fed. Appx at 367 (same).

Having considered the relevant guideposts, we give considerable weight to Trans Union's recidivist conduct in setting an appropriate ratio.  As discussed earlier, Trans Union had been warned repeatedly that its reinvestigation obligation in verifying a disputed account requires more than parroting the original source's response.  Nevertheless, it continues to ignore these judicial edicts and refuses to change the way it does business.  Indeed, Steve Newnom testified that, as a matter of policy, Trans Union will not go beyond the original source to verify any dispute.  *See Newnom Trial Tr.* at 130.  This refusal to follow judicial direction convinces us that "strong medicine is required to cure the defendant's disrespect for the law." *Gore*, 517 U.S. at 576-77 (1996).[8]

We also consider the size and wealth of Trans Union in fashioning a proper punitive award.  Punitive damages are intended to punish the defendant, not compensate the

---

[8] Trans Union asks the Court to follow the Third Circuit's non-precedential opinion in *Jurinko* and reduce the ratio to 1-to-1.  However, the Third Circuit's opinion in *Jurinko* is based on facts drastically different than those presented here.  First, the compensatory award in *Jurinko* was $1,658,345 - a considerably larger amount than the $30,000 awarded to Dixon-Rollins.  Second, the *Jurinko* Court specifically noted that there was little evidence that the defendant was a recidivist.  Here, there is no doubt that the record supports a conclusion that Trans Union is a frequent offender of the FCRA.

plaintiff. *Cortez,* 2010 WL 3190882, at *21 n.37.   Consequently, a "jury can consider the relative wealth of a defendant in deciding what amount is sufficient to inflict the intended punishment." *Id.* (citations omitted).   Trans Union is a commercial company with a net worth over one billion dollars. *Trial Exh.* 72.   Based on its repeated conduct, it appears that Trans Union has made a risk-benefit analysis, concluding that it is worth the risk to continue doing business as usual and to ignore its obligations under the FCRA.   Thus, any punitive award must be of sufficient size to deter Trans Union from disregarding its legal obligations.

Considering the modest compensatory award, Trans Union's relative size and wealth, and its repeated FCRA violations, we conclude that a more appropriate ratio of punitive to compensatory damages should be 9-to-1.   Therefore, we will reduce the punitive damage award against Trans Union from $500,000 to $270,000.[9]

### Conclusion

Trans Union has failed to demonstrate that the jury's verdict is critically deficient of the necessary evidence to warrant disturbing it.   The jury's award of $500,000 in punitive damages, however, is not reasonable and proportionate to the harm inflicted by Trans Union's erroneous reporting of the ACCB collection account.   Therefore, we shall deny the motion for judgment of acquittal or a new trial, and reduce the jury's award of punitive damages to $270,000.

---

[9] Because we are reducing the punitive award in order to avoid a denial of due process, the reduction is made as a matter of law and there is no right to a new trial. *Cortez,* 2010 WL 3190882, at *20.